

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-79,196-01

### EX PARTE ROBERT ALAN HARLESTON, JR., Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 1205091-A IN THE 176TH DISTRICT COURT
### FROM HARRIS COUNTY

**HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, KEASLER, COCHRAN, and ALCALA, JJ., joined. PRICE, J., filed a concurring opinion in which JOHNSON, J., joined. WOMACK, J., dissented.**

## O P I N I O N

Applicant, Robert Harleston, Jr., is currently serving a twenty-five-year sentence

for the aggravated sexual assault of a child. In this application for a writ of habeas corpus,

Applicant claims that he is actually innocent based on the victim's alleged recantations.

After conducting a live evidentiary hearing, the habeas court adopted findings of fact that

the victim's recantations were credible and recommended that this Court grant relief.

After independently reviewing the record, we reject the habeas court's findings

that the victim's recantations were credible because those findings are not supported by

the record, and we hold that Applicant has failed to present clear and convincing evidence that unquestionably establishes his innocence. Therefore, we will deny relief.

## I. PROCEDURAL HISTORY AND BACKGROUND

In April 2007, the victim, K.D., spoke to a school counselor about a sexual matter unrelated to the charges against Applicant. During that conversation, the counselor asked K.D. about her sexual history. In response, K.D. revealed to the counselor that her first sexual experience was with Applicant on Thanksgiving night of 2004 when he "put his hands in between her legs and had put his penis inside of her."[1] K.D. was twelve years old at the time. The counselor immediately notified law enforcement, and following an investigation, Applicant was arrested and charged with aggravated sexual assault of a child, to which he pled not guilty. At trial, testimony was adduced that Applicant sexually assaulted K.D. again that same night in the living room and a third time on an unspecified day in his vehicle. Applicant was convicted by a jury of his peers and sentenced to twenty-five years' imprisonment after pleading true to an enhancement allegation.

On appeal, Applicant argued that he did not receive a proper jury trial because a

---

[1]The familial situation of K.D. is complicated. Barbara is the mother of Gregory and Sheila, and Sheila has two children: Kedrick and LaGarrin. K.D. was adopted by Barbara "about three months after [she] was born" when Barbara was about 50 or 55 years old. By 2005, Barbara suffered from a number of health ailments that began around 2003 or 2004. Barbara passed away on January 9, 2006.

Although Sheila is K.D.'s legal sister, K.D. testified that she viewed both Barbara and Sheila as mother figures. And although Gregory is K.D.'s legal brother, she referred to him as "uncle." Gregory testified that Barbara allowed K.D. to call Sheila "mother" because Sheila had two children about K.D.'s age, and Barbara and Sheila did not want K.D. to feel left out because she was adopted.

juror allegedly slept through a portion of testimony. The court of appeals held that Applicant failed to preserve that complaint for appellate review. *See Harleston v. State*, No. 01-09-00481-CR, 2010 WL 2873590 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (mem. op.) (not designated for publication). Applicant then filed a petition for discretionary review, which this Court refused on January 12, 2011.

Just over a month after Applicant's petition for discretionary review was refused, K.D. hand wrote a nine-page affidavit allegedly recanting, for the first time, all of her allegations against Applicant. Applicant then filed an application for a writ of habeas corpus arguing that K.D.'s recantation proves by clear and convincing evidence that he is actually innocent of the aggravated sexual assault of K.D. The habeas judge, who was the same judge that presided over Applicant's trial, held a live evidentiary hearing at which two witnesses testified: K.D. and K.D.'s mother (Sheila). K.D.'s testimony was highly inconsistent because she recanted her allegations and repudiated those recantations multiple times.

The habeas court made findings of facts that certain exhibits and portions of K.D.'s testimony in which she recanted her trial testimony were credible and then recommended that we grant Applicant relief because K.D.'s credible recantation proves by clear and convincing evidence that Applicant is actually innocent of the crime for which he was convicted.

## II. DISCUSSION

To prevail in a freestanding claim of actual innocence, an applicant must prove "by

clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence." *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006) (quoting *Ex parte Tuley*, 109 S.W.3d 388, 392 (Tex. Crim. App. 2002)); *see Ex parte Elizondo*, 947 S.W.2d 202, 207 (Tex. Crim. App. 1996). The burden placed upon the applicant to prevail in a freestanding-actual-innocence claim is a "Herculean task" because, once an applicant "has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears[,]" and "in the eyes of the law, [the applicant] does not come before the Court as one who is 'innocent,' but . . . as one who has been convicted by due process of law . . . ." *See Herrera v. Collins*, 506 U.S. 390, 399–00 (1993). "[W]hen [an applicant] has been tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants, it is appropriate to apply an 'extraordinarily high' standard of review." *Elizondo*, 947 S.W.2d at 208 (quoting *Herrera*, 506 U.S. at 404 (O'Connor, J., concurring) (internal quotation marks omitted) (citations omitted)). This is because an applicant alleging a *Herrera* claim is directly attacking the propriety of his conviction, although the applicant does not dispute that he received an error-free trial. *Id.* at 209 ("[A]n exceedingly high standard applies to the assessment of claims of actual innocence that are not accompanied by a claim of constitutional error at trial."). As a result, an applicant alleging a *Herrera* claim must make "an exceedingly persuasive case that he is actually innocent." *Id.* at 206.

When an applicant presents new exculpatory evidence under Article 11.07 of the

Texas Code of Criminal Procedure alleging facts that, if true, prove his or her actual innocence, the habeas court may conduct a live evidentiary hearing and consider affidavits, depositions, interrogatories, and the judge's own personal recollection if the habeas judge was also the trial judge, as in this case. *See* TEX. CODE. CRIM. PROC. art. 11.07, § 3(d); *see also Brown*, 205 S.W.3d at 546. If a live hearing is held, the habeas court should assess the credibility of any witnesses and other admitted evidence. But regardless of whether a hearing is held, and before the habeas court can make a proper recommendation to this Court, the court must assess the probable impact of the new evidence, and then weigh the newly discovered evidence against the old inculpatory evidence to determine whether the applicant has met the burden of proof necessary to unquestionably establish his innocence. *Ex parte Franklin*, 72 S.W.3d 671, 677–78 (Tex. Crim. App. 2002) (quoting *Elizondo*, 947 S.W.2d at 206). The habeas court then memorializes its findings of fact and conclusions of law and recommends to this Court whether relief should be granted. *Brown*, 205 S.W.3d at 546.

When reviewing a habeas court's findings of fact and conclusions of law, we defer to those findings and conclusions if they are supported by the record. *Id.* We defer to findings supported by the record because the habeas court is the "original factfinder" and is in the best position to evaluate the credibility of testifying witnesses. *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). However, our deference is not a rubber stamp, and we can invoke our authority as the ultimate fact finder to make contrary or alternative findings and conclusions "[w]hen our independent review of the record reveals

that the trial judge's findings and conclusions are not supported by the record . . . ." *Id.*

This authority extends, when necessary, to making findings contrary of the habeas

court—despite the fact that a finding may be based on credibility. *Id.* at 727. "[F]actors

other than demeanor and inflection go into the decision whether to believe a witness."

*Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). For example, "[d]ocuments or

objective evidence may contradict the witness' story; or the story itself may be so

internally inconsistent or implausible on its face that a reasonable factfinder would not

credit it." *Id.* Moreover, we have held that "when numerous, but not all, findings and

conclusions are not supported by the record, the determination of the level of deference to

be accorded to the findings and conclusions as a whole is to be made on a case-by-case

basis." *Reed*, 271 S.W.3d at 727.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

In order to fully review the findings of fact and conclusions of law from the habeas

court, we quote them in their entirety here:

> This Court has now held an evidentiary hearing at which it heard the
> testimony of two witnesses. Having duly considered the Application and the
> exhibits thereto, together with the State's answer, the oral and documentary
> evidence presented at the evidentiary hearing, the trial court record, the
> briefs and arguments of the parties' counsel, and this Court's personal
> recollection as the trial judge in this cause, the Court now makes the
> following as [its] Findings of Fact and Conclusions of Law:

> **Statement of the Case and Procedural History**

> On 3/19/09, the jury convicted Applicant of Aggravated Sexual
> Assault of a Child, [K.D.], and this Court assessed punishment at 25 years
> TDC-ID. The conviction and sentence were affirmed on direct appeal in

*Harleston v. State*, 01-09-0481-CR, Tex. App.- Houston [1st District] on 7/22/10. The Texas Court of Criminal Appeals denied discretionary review on 1/12/11, CPD-1138-10.

On 4/5/11, Applicant, represented by Danny Easterling[,] filed an Application for Writ of Habeas Corpus alleging that he was innocent of the offense of Aggravated Sexual Assault of a Child. On 10/27/11 and 2/23/12 an evidentiary hearing was held. A record from this hearing at which two witnesses testified and exhibits were offered and admitted. The record from this hearing was transcribed and two witnesses testified and 3 exhibits were offered and admitted by the defense.

For the reasons set forth, this Honorable Court will recommend to the Court of Criminal Appeals that applicant is entitled to a new trial.

**Applicant's Claim of Innocence**

The Defendant is factually and legally innocent and his continued incarceration due to this unlawful conviction violates the Fourteenth Amendment and [A]rticle I, Sections 13 and 19 of the Texas Constitution.

**The Standard of Review for Innocence Claims**

The Court of Criminal Appeals has determined that actual innocence is grounds for collateral attack. *Ex parte Elizondo* 947 S.W.2d, 202 (Tex.Crim.App 1996). The court granted relief and held that the conviction of an innocent man would violate the Fourteenth Amendment to the U.S. Constitution and fundamental notions of fairness. The *Elizondo* case is uniquely on point here as[ . . . ]both[ . . . ] involved a childhood accusation of sexual assault that was later recanted when the child became an adult. Applicant is raising an actual innocence claim recognized in *Herrera vs. Collins* 506 U.S. 390 (1993). A Herrera type of claim is a substantive claim in which the applicant asserts a "bare claim of innocence based solely on newly discovered evidence." *Ex Parte Franklin*, 72 S.W.3d 671 (Tex.Crim.App. 2002). This type of innocence claim requires the applicant to show by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence. Applicant must show that the evidence that he is presenting is "newly discovered" or "newly available" and that such is affirmative evidence of his innocence. *Ex Parte Spencer* 337 S.W. 3d 869 (Tex. Crim. App 2011).

The "new" evidence upon which applicant relies is the recantation of the one and only victim/complainant in this case. This could not have been known to him even with the exercise of due diligence. For this reason, the evidence satisfies the "newly discovered" or "newly available" standard. Although a strong presumption of finality to a criminal conviction exists, it must sometimes yield so that a "fundamentally unjust incarceration" may be corrected. *Ex Parte Franklin* 72 S.W 3d 671 (Tex.Crim.App. 2002).

## FINDINGS OF FACT

1.      The Court finds that newly discovered evidence of the recantation of the complainant, [K.D.], exists which demonstrates the factual innocence of applicant for the offense of Aggravated Sexual Assault of a Child for which he stands convicted in this cause.

2.      This newly discovered evidence of the recantation by the complainant, [K.D.], creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that verdict would be different in a new trial.

3.      The Court finds that by clear and convincing evidence that [K.D.] testified falsely about sexual abuse at the jury trial of this cause and it was primarily upon this false testimony of [K.D.] that applicant was convicted in this cause.

4.      The Court finds that this newly discovered evidence of recantation by the complainant, [K.D.] was unknown to the applicant at the time of trial and the "failure" to discover such evidence was not due to a want of diligence on the part of the applicant or his counsel.

5.      The court finds that the affidavit of the complainant, [K.D.], recanting her allegations of Aggravated Sexual Assault of a Child against Robert Harleston to be truthful and credible, specifically the following statements:

    a.      "Robert never touched me in any physical way."

    b.      "I accused Robert only because my young hormones kicked in and I thought of some things that I wanted to feel."

    c.      "I was confused, sad[ . . . ]and started telling her that Robert

touched me and he raped me. I had already been sexually active and I used my first experience that I had with this dude that I really liked and I started saying Robert forced himself upon me only because the bully that I was messing with did that to me and also I kinda felt everyone was against me so I wanted attention from people."

d.      "That's when the process of me lying and blaming something on an innocent man started. I thought about the dude I had dealt with and I pictured him as Robert so instead of me saying the actual name of the boy I said it was Robert that done it to me and Lord knows I was lying."

e.      "I felt sick even saying it over and over to the therapist."

f.      "I cried once I left from the stand because I know I had messed up someone's life and I didn't want that. It kills me every time I think about what I did and for accusing an innocent loving man that only wanted to help me in my life. I deeply regret what I have done."

g.      "Please help me fix my mix up."

h.      "So please help me fix this issue please."

6.      The Court finds that Applicant's exhibit number 1, the videotaped sworn deposition by [K.D.] on April 7, 2011 in the law offices of Danny Easterling, where she recants the trial testimony, to be truthful and credible. The court further finds that her sworn testimony that day that the Aggravated Sexual Assault of a Child allegations never actually happened to be truthful and credible. The Court further finds that she fully recanted her allegations of criminal activity by Applicant under oath. The Court further finds that her original allegations had formed the basis of the charge and her testimony in front of the jury that convicted Mr. Harleston of Aggravated Sexual Assault of a Child.

7.      The court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing on 10/27/11, that her mother, Sheila[], asked her to write an affidavit recanting her testimony to not be truthful and not credible.

8.  The Court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing that her recantation and her affidavit filed with the court and attached to the Writ of Habeas Corpus was not true to not be truthful and not credible. [K.D.]'s testimony that her whole affidavit was a lie and was not credible and not truthful. The Court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing that she did the affidavit to "throw it out for my mother, so he could come home for her" to be not truthful and not credible.

9.  The Court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing on this specific question by Judge Shawna Reagin:

    > THE COURT: The question he is asking now, which is the truth, did the abuse happen or did it not?
    >
    > THE WITNESS ([K.D.]): No.
    >
    > THE COURT: It never did?
    >
    > THE WITNESS ([K.D.]): No.

    to be truthful and credible.

10. The Court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing as follows:

    > PROSECUTOR: Now, did this man have sex with you or not?
    >
    > THE WITNESS ([K.D.]): No.

    to be truthful and credible.

11. The Court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing that the Applicant put his finger in her vagina to be not credible and not truthful.

12. The Court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing that the Applicant did not place his penis inside her vagina and did not place his fingers inside of her vagina as

credible and truthful.

13. The Court finds that the complainant, [K.D.]'s testimony at the evidentiary hearing that the Applicant is innocent of this charge to be truthful and credible.

14. The Court finds that the testimony of the complainant's mother, Sheila[], at the evidentiary hearing to be truthful and credible.

15. The Court specifically finds Sheila['s] testimony at the evidentiary hearing that the complainant, [K.D.], came to her and told her that "it had been bothering her that she had lied on an innocent man, Robert" to be truthful and credible.

16. The Court finds that Sheila['s] testimony at the evidentiary hearing that she did not help or tell [K.D.] to write her affidavit of recantation to be truthful and credible.

17. The Court finds that Applicant's exhibit number 3, the affidavit signed by the trial counsel at Applicant's jury trial, Tyronne Moncriffe, that throughout his [representation] the Applicant insisted that he was innocent of this felony allegation to be truthful and credible.

18. The Court finds that this original charge of Aggravated Sexual Assault of a Child was not true by clear and convincing evidence. The original case had no supporting forensic evidence whatsoever and was wholly based upon the testimony of the complainant, [K.D.], who has now fully recanted her allegations. Mr. Harleston has never admitted to this crime and has consistently denied that it ever took place and that he is innocent.

19. The Court finds that without [K.D.]'s original allegations, this charge could not have gone forward. The Court finds that there is no other evidence to support the charge of Aggravated Sexual Assault of a Child or the conviction by the jury.

20. The Court finds that the applicant has met the threshold of clear and convincing evidence to establish his actual innocence based upon the

credible and truthful recantation by the only witness for the State,[2] the complainant [K.D.], a lack of any evidence pointing to this incident actually taking place, and the demeanor and truthful statements given by both [K.D.] and Sheila[] at the videotape deposition and on the witness stand at the evidentiary hearing.

21.    The Court finds that based upon all of the credible evidence and it's own determination of the witnesses' truthful and credible behavior that this claim should merit relief.

## CONCLUSIONS OF LAW

1.    This Court concludes that pursuant to Ex Parte Elizondo and its progeny that the issue that the further imprisonment of the applicant who is innocent of this charge is a violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

2.    The Court concludes that based upon the credible testimony of the witnesses and affidavits, in a sworn statement, a videotape deposition and sworn testimony at an evidentiary hearing and the lack of other supporting evidence to sustain the original charge that the applicant has satisfied his burden proof by clear and convincing evidence. He is innocent of this charge.

3.    The Court concludes as a matter of law that the applicant has plead facts which establishes his actual innocence and has proven them by clear and convincing evidence and thus merits relief.

4.    The Court concludes that the applicant has proven by clear and convincing evidence that no reasonable juror would have convicted him of the Aggravated Sexual Assault of [K.D.] in light of the new evidence presented to this Court.

## RECOMMENDATION AND ORDER OF THE COURT

The Court hereby recommends to the Court of Criminal Appeals to vacate the judgement of conviction and Order a new trial and that the

---

[2]The record shows that the State called nine witnesses to testify at Applicant's trial, including K.D.

applicant be returned to the custody of the Harris County Jail to answer any indictment made against him arising out of this cause.

## IV. HABEAS RECORD

1

### A. Complainant's habeas testimony

The record shows that on February 17, 2011, K.D. hand wrote an affidavit[3] at Sheila's house recanting her accusations against Applicant. This affidavit forms the basis for Applicant's argument that he is entitled to relief. K.D. begins the affidavit by stating that "[Applicant] never touched me in any physical way," and that she falsely accused him because of her "young hormones" which caused her to think of "some things [she] wanted to feel." Regarding the night of the incident, K.D. wrote:

> Then my grandmother passed away and that made me terribly sad and I started feeling very alone, I started spacing my self away from my family and on this night I was sad and Robert was talking to me and helping me grieve and that ment a lot . . . . [T]hen the conversation [about sex] I had with my friends was playing over and abt things they had done with a boy. Robert comforted me and I starting thinking thoughts abt if Robert could touch me like my freinds said they felt. Robert never did what I was thinking of from my friends conversations with me.

K.D. then stated that she eventually ran away from home because her mother and Applicant were arguing a lot, and that she ended up living with her Uncle Gregory and his family. While at her new home, K.D. wrote that her curiosity about sex increased:

> I was in school 7th grade at Hodges Bend Middle School. I met knew girls that were older than me once again and they talked about sex but on a much

---

[3]Excerpts from the handwritten affidavit have not been edited for grammar or spelling.

> deeper level than when I was in the 6th grade. [B]ut I still was the virgin out
> the group and I wanted to know what it felt like but I just didn't know how
> to do it or who to do "it" with.

Next, K.D. stated that she got in trouble for sneaking a boy into her room at night, that the boy (now her ex-boyfriend) later confronted her in front of her house after mistakenly thinking he saw her with another boy, and that her Uncle Gregory came out with a shotgun to chase him away. Following the aforementioned incident, K.D. subsequently wrote that she was sad and confused, that she had been sexually assaulted by a boy whom she liked, and that in her state of confusion, she decided to blame the sexual assault on Applicant instead. In contrast to the evidence at trial, K.D. stated that she first revealed the abuse to her cousin and then her uncle and aunt (and not the school counselor as she testified at trial).

> I was grounded, I felt like I had no life, then my cousin/sister leah smith
> came home from college . . . and I was down there talking to her about
> things and we got on the topic of my mama (Sheila) and then robert . . . . So
> when we talked about things that was going on with my mama and robert
> and I started telling her that robert touched me and he raped me . . . and I
> used my first experience that I had with this dude that I really liked and I
> started saying robert forced himself upon me only because the boy that I
> was messing with did that to me and also I kinda felt every body was
> against me so I wante attention from people.

Recounting the events of the following day, K.D. wrote that she was taken to see Child Protective Services ("CPS") workers and that she repeated the same story to them about having been sexually assaulted by Applicant, although it was actually a boy who had assaulted her.

> [I] woke up the next morning and went to school, their were people coming

to take me out of school, taking me to CPS places and I got questioned by some lady in a room then we went back to the place . . . and that's when the process of me lying and blaming something on an innocent man started. I thought about the dude I had dealt with and I pictured him as robert so instead of me saying the actual name of the boy I said it was Robert that done it to me lord knows I was lying and I felt sick even saying it over and over to therapist it just made it easier for me to be comfortable enough to say it when I got in the courtroom and I cried once I left from the stand because I know I had messed up someones life and I didn't want that.

K.D. then concluded her affidavit:

It kills me every time I think about what I did and for accusing an innocent loving man that only wanted to help me in my life. I deeply regret what I've done to cause this confusion and I really am sorry for wasting your time . . . so please help me fix this issue. Please!

After Applicant's postconviction counsel received the affidavit, he filed this application for a writ of habeas corpus on behalf of Applicant. Two days later, Applicant's counsel interviewed K.D. about her recantation in a recorded video deposition. Responding to counsel's questions, K.D. explained that her brother Kedrick, who testified for Applicant at his trial, and some other friends took her to the office of Applicant's attorney for the deposition. She confirmed that she was recanting, that the story she wrote in her affidavit was true, that she was recanting of her own free will, and that no one had pressured her to recant.

In October 2011, the habeas court conducted a live evidentiary hearing at which K.D. testified. At the hearing, however, K.D. immediately repudiated her recantation and stated that the "whole affidavit is a lie," that she wrote it only because she wanted to "please my mother," and that her mother asked her to write it "because she wants

[Applicant] home." Applicant's counsel then began asking K.D. about her written affidavit:

> [COUNSEL]: Okay. And where did you write it?
>
> [K.D.]: At my mother's house
>
> [COUNSEL]: Okay. Did you write it of your own free will?
>
> [K.D.]: No.
>
> [COUNSEL]: Why not?
>
> [K.D.]: Because [Sheila] asked me to write it.
>
> [COUNSEL]: Okay. Why did she ask you to write it?
>
> [K.D.]: Because [Sheila] wants him home.
>
> [COUNSEL]: Okay. All right. So why did you write it?
>
> [K.D.]: To please my mother.
>
> [COUNSEL]: Okay. In that affidavit you start out in the first paragraph saying Robert never touched me in any physical way. Do you remember that?
>
> [K.D.]: Yes.
>
> [COUNSEL]: And you swore to that under oath?
>
> [K.D.]: Yes.
>
> [COUNSEL]: Is that the truth?
>
> [K.D.]: No.
>
> [COUNSEL]: You lied in your affidavit?
>
> [K.D.]: Yes. And I admit that I did lie. That whole affidavit is a lie.

Applicant's counsel then followed up by asking K.D. about the reasons she gave in her affidavit for making up the accusations, and K.D. responded that she had lied about those too:

[COUNSEL]: Now, let's talk about your reasons that you told me in the deposition where you lied in court and to the police, to the DA's, CPS, and your therapist, and even back to the first person, your counselor at school, okay. Do you remember you discussing that?

[K.D.]: Yes.

[COUNSEL]: Okay. Do you remember telling me that your young hormones were kicking in back around that time? Do you recall telling me that?

[K.D.]: Yes.

[COUNSEL]: Was that true or false?

[K.D.]: That's false.

\*        \*        \*

[COUNSEL]: Okay. You told me you hung out with older girls and we talked about sex. That was true, wasn't it.

[K.D.]: No.

[COUNSEL]: That was not?

[K.D.]: I don't really -- I didn't have friends. I didn't have any, like, friends to hang out with. I wasn't able to go outside. I didn't have friends.

[COUNSEL]: Do you remember telling me that you had your first experience with sex, it was terrible and it was with a boy named Dominique?

[K.D.]: Yes.

\*        \*        \*

[COUNSEL]: And you told me, if you recall, that he forced you and you were scared you weren't ready. Do you remember?

[K.D.]: Yes.

[COUNSEL]: Okay. Was that true or false?

[K.D.]: That was false.

[COUNSEL]: You made that up?

[K.D.]: Yes.

[COUNSEL]: Remember you told me, I decided just to blame it on [Applicant] since Dominique was not around. Do you remember telling me that?

[K.D.]: Yes.

[COUNSEL]: Is that true or false?

[K.D.]: False.

*   *   *

[COUNSEL]: Why'd you lie to me about something so important?

*   *   *

[K.D.]: As far as Dominique?

[COUNSEL]: Yes.

[K.D.]: Dominique's not real. There is no Dominique.

At one point during the hearing, K.D. suddenly became unresponsive.

[COUNSEL]: Well, here we are, we're in court now. Which [story] is the truth, which version is the truth, [K.D.]? Because you've given different versions. You understand that, right?

[K.D.]: Yes.

[COUNSEL]: Radically different versions. You understand that, right?

[K.D.]: (No response.)

[COUNSEL]: I mean, it either happened or it didn't happen. Do you know what we're talking about here?

[K.D.]: Yes.

[COUNSEL]: Okay. So which version is true, sexual abuse happened or it didn't happen?

[K.D.]: (Pause.)

[COUNSEL]: Let the record reflect she's taking a long time to answer this question.

[K.D.]: I am.

\*        \*        \*

[COUNSEL]: I want the record to reflect she's taken 20 to 30 seconds to answer a question and looking around the courtroom, Judge.

[STATE]: I'd also like the record to reflect that the applicant in this writ is giving her a major stare down while she's thinking.

[APPLICANT]: What am I supposed to do, my life is on the line.

[COURT]: Mr. Harleston, you don't talk. You don't talk.

When K.D. was unresponsive for about a minute, the judge asked her directly:

[COURT]: [W]hich is the truth, did the abuse happen or did it not?

[K.D.]: No.

[COURT]: It never did?

[K.D.]: No

[COURT]: Thank you.

On cross-examination, the State commented that K.D.'s demeanor during questioning by Applicant's counsel changed significantly, and it asked her what she was feeling right then. K.D. responded that she did not care anymore, and that "I just hope that him and my mama are happy, that's all I want." Later, K.D. testified that she told Lynette Hulette, a third cousin of Barbara, that she wrote the affidavit recanting her allegations because Sheila kept asking K.D. to write one and telling her that Applicant "had been in jail long enough" and it was time to get him home. K.D. then agreed with the State when asked whether she agreed to lie about Applicant sexually assaulting her so that "Sheila could have her man back . . . ." After additional questioning, K.D. partially repudiated her recantation and stated that Applicant had inappropriately touched her, but that the incident in the bedroom never happened. When K.D. was asked again on redirect whether Applicant had touched her sexually, K.D. implicitly repudiated the rape allegation when she replied that Applicant had touched her genitals with only his fingers but not with his penis. When informed that such an act would still constitute sexual assault, K.D. changed her story once again and stated that Applicant never touched her sexually at all.

## B. Inconsistencies

The habeas court found that K.D.'s trial testimony was not credible, but that K.D.'s handwritten affidavit, her videotaped deposition, and one of her (several) stories at the live evidentiary hearing that Applicant is innocent, were credible. However, the habeas court found that K.D.'s repudiation of her recantation and subsequent repudiation

of her second recantation were not credible. All of these findings were made without explanation. However, a review of K.D.'s stories shows that they are internally inconsistent and present implausible explanations of why K.D. may have made up the sexual-assault allegations. Perhaps the most egregious inconsistency is K.D.'s statement in her affidavit that she accused Applicant of raping her after Applicant comforted her when her grandmother passed away. Allegedly because of Applicant's support, K.D. started having thoughts about Applicant touching her "like [her] friends say they felt" in their discussions with K.D. about sex, and her "young hormones" compelled her to make something up that she had fantasized about.[4] However, the night in question was Thanksgiving 2004, and K.D.'s grandmother did not pass away until January 9, 2006. Thus, it would have been chronologically impossible for Applicant to help K.D. grieve the loss of her grandmother if her grandmother was not yet deceased. The only other ways to interpret K.D.'s story would be that she confused the relevant dates or, because she appreciated Applicant for helping her grieve the loss of her grandmother in 2006, she made up allegations that he raped her in 2004, which is implausible.

Later in her affidavit, K.D. stated that she allegedly made the false sexual-assault allegations against Applicant, instead of against a boy who had actually raped her (but she "really liked"), to her cousin Leah Smith: "I used my first experience that I had with this

---

[4]In this story, K.D. implies that she fantasized about engaging in sexual intercourse with Applicant because she saw him as a "father figure" and someone who was helping her cope with a difficult grieving process after her grandmother died. However, in another story, K.D. states that she told one of her cousins that "Robert touched me and he raped me . . . ."

dude that I really liked and I started saying Robert forced himself upon me only because the boy I was messing with did that to me and also I kinda felt every body was against me so I wante[d] attention from people." Her assertion that the first person she told about the abuse was her cousin was contradicted by testimony previously given by K.D. Nonetheless, after revealing these apparently false, but explosive allegations, and although she wanted attention from people, she inexplicably stated that she asked Leah not to say anything about the abuse to anyone. Moreover, K.D. never explained why she chose not to accuse the boy who had actually raped her or why she decided to blame an apparently innocent person for a rape committed by another person.

During the live evidentiary hearing, K.D. told a number of different, conflicting stories. First, K.D. repudiated the recantation in her handwritten affidavit and claimed that the whole "affidavit [was] a lie." Applicant's counsel then asked K.D. about each statement in her affidavit, and she denied that each of the statements in her affidavit was true. For example, she stated that her hormones were not "kicking in" around the time of her allegations, and that she did not hang out with older girls and talk about sex because she "didn't have friends" and could not go outside. In addition, she testified that the story she told about a boy named Dominique who forced himself upon her and for which she blamed Applicant was not true. The boy Dominique did not exist. Applicant's counsel also asked her about her statements in the recorded deposition at counsel's office confirming her handwritten recantation, and she testified that she had also lied in the recorded deposition. Then, when Applicant's counsel told K.D. that she had told

"radically different" stories, and he asked her which story was true, K.D. did not respond for almost a full minute. During this period, the State objected that "the applicant in this writ is giving [K.D.] a major stare down while she's thinking." Finally, the judge directly asked K.D. whether the sexual assault by Applicant happened, and K.D. suddenly recanted again and testified that Applicant did not sexually assault her. Later, she changed her story a third time, in the form of a partial recantation when she alleged that she was being truthful about Applicant inappropriately touching her, but that she had lied about Applicant raping her. However, when Applicant's counsel noted that inappropriate touching could still constitute sexual assault, she changed stories yet again and returned to fully recanting and claimed that Applicant had never touched her.

K.D.'s first recantation in the form of her handwritten affidavit contained her most detailed statements regarding what "actually happened" if Applicant did not sexually assault her, as she originally alleged and the jury believed. Her two later recantations merely consisted of perfunctory statements that she was not sexually assaulted by Applicant. In addition, K.D. testified that she falsely swore out the affidavit because K.D. wanted her mother to be happy, and her mother had pressured her to write the affidavit. Furthermore, because Sheila had been pressuring her to write the affidavit, K.D. thought that her mother would be happy with Applicant and that her mother wanted Applicant to get out of jail.

2

**A. Sheila's habeas testimony**

In February 2012, the court continued its evidentiary hearing at which time Sheila testified. At that hearing, Sheila began her testimony by stating that she and K.D. "always had a great relationship." But she also testified that K.D. was not a truthful girl growing up, and that she was "deceitful." When asked whether she believed the allegations made by K.D. against Applicant, she demurred and stated that she had her doubts because she did not believe that it was in Applicant's character to sexually abuse a child. She also testified that it was K.D. who had first approached her to confess that she had falsely accused Applicant and that she did not pressure or influence K.D. to recant because she had no motive to pressure K.D. because she and Applicant were no longer in a relationship. When asked whether K.D. had asked to visit Applicant in county jail, Sheila responded that she had, but Sheila was concerned about whether K.D. could handle seeing him. Apparently Sheila did not know why K.D. wanted to visit Applicant in the county jail, but she testified that K.D. visited him twice.

On cross-examination, the State asked Sheila how her relationship with K.D. could have been "great," as Sheila characterized it earlier in her testimony, if Sheila did not even know where K.D. was living since moving out of her home and having almost no contact with her, which eventually culminated in them not speaking anymore. Sheila responded, "I don't know where she went to, and it bothered me. I didn't know how to get in touch with her." The State then asked Sheila if she discovered through a cousin (Lynette Hulette) that K.D. was living in a shelter, to which she responded that she did become aware of that fact, but that K.D.'s stay at the shelter was only "for a few days."

Sheila also stated that she was living with Lynette at that time and tried to get K.D. to move in with them, but K.D. refused to stay at Lynette's house because "she didn't want to be at [her] house." Finally, the State asked Sheila if she still loved Applicant and whether she would still try to "have a life" with him if he were released from prison, to which she responded that she loved him at one time but had no interest in having a life with him, even when he was released from prison.

## B. Inconsistencies

The habeas court's findings with respect to Sheila's habeas testimony are directly contradicted by other evidence in the record. Sheila testified that she did not influence K.D., and that she had no motive to do so because she and Applicant were no longer together. And the habeas court found this testimony to be credible and truthful. However, less than two months after the hearing, and before the findings of fact and conclusions of law were signed by the habeas court, a letter was sent to Applicant, in which the author stated that he or she loved Applicant, and that he or she still considered himself or herself his "wife." The letter was signed, "Love you always and forever." When compared with the other written letter in evidence signed by Sheila, it appears to have been written by the same person. Moreover, besides the handwriting in both letters appearing virtually identical, both letters use many of the same phrases. This evidence was available to the habeas court, but without addressing any of Sheila's conflicting actions or testimony or the conflicting record evidence, the habeas court found Sheila's statement to be truthful and credible that she was no longer in a relationship with Applicant and had no motive to

influence K.D.[5]

## 3

### A. Other record evidence

Applicant's evidence in the habeas record consisted of the video-taped deposition of K.D., a transcript of that deposition, and an affidavit from Applicant's trial counsel. Trial counsel's affidavit stated that Applicant maintained his innocence throughout his representation of Applicant. The State included a copy of general orders of the trial court; a copy of Applicant's judgment, sentence, and indictment; a digital video disc of K.D.'s interview at the Fort Bend Children's Assessment Center; K.D.'s handwritten affidavit; one letter addressed to Sheila's son LaGarrin, signed by Sheila, and with her name and return address written on the envelope; a second unsigned letter addressed to Applicant with Kedrick's name and return address; and an affidavit from Lynette Hulette, a third cousin of Barbara .

Lynette's affidavit was filed on November 22, 2011, about three months before Sheila testified at the live evidentiary hearing. Lynette stated in her affidavit that prior to Barbara's death, the entire family, including herself, was "very close and spent a lot of time together." She went on to say that "Sheila[] has a very poor reputation for truth-

---

[5]Evidence at Applicant's trial also indicated that, although Sheila testified that all of her children attended school and graduated, her two sons did not finish high school and K.D. had been held back one year in school because of attendance problems. Sheila also eventually admitted that Kedrick had dropped out of school and obtained his GED, and that LaGarrin could not finish high school because he was incarcerated but was working towards his GED.

telling in our family. Sheila's own mother once commented that her daughter, Sheila, was a 'big liar' because she can look you straight in the face and tell a lie." She also agreed with Sheila's habeas testimony that Sheila did live with her for a time and, commenting on that period, she stated

> Sheila told me that she was no longer in touch with [Applicant], but while she lived with me [from mid-August to September 30, 2011,] she received numerous calls from the Harris County Jail. On the day of [Applicant's] hearing in September 2011, I received a collect call from the jail at my home and accepted the charges. It was [Applicant], he identified himself and then asked for Sheila. I was very angry that Sheila had obviously given him or his lawyer my phone number. I could hear Sheila's side of the conversations with Robert and . . . . I was shocked to learn that Sheila was helping [Applicant].

Lynette then stated that "Sheila said that [Applicant] had been in jail long enough and it was time for him to come home." Despite the fact that this affidavit had been admitted into the habeas record approximately three months before Sheila testified, Applicant did not question Sheila about Lynette's affidavit or address it in any way. In addition, the habeas court never made a finding with respect to Lynette's affidavit.

Lynette also described an incident when her sister, L.A., got in touch with K.D. over the social-media platform Facebook. She stated in her affidavit that, after L.A. spoke with K.D., L.A. asked Lynette to talk to K.D. "because Sheila was putting a lot of pressure on [K.D.] to help [Applicant] and get him out of jail." When Lynette spoke with K.D., she asked "[K.D.] point blank if [Applicant] had sexually assaulted her and she admitted that he had." When Lynette asked K.D. about the handwritten affidavit she wrote, K.D. told her that Sheila kept harassing her to recant, and K.D. said that she

believed that if she wrote the affidavit, Sheila would start caring for her again. Lynette also explained that K.D. told her that "around Christmas," Sheila made K.D. speak with Applicant over the phone, and "he apologized for 'everything.'" After that, Lynette was very angry with Sheila "because it was obvious that she was putting [Applicant] ahead of her child."

Lynette also relayed a personal recollection of being at Barbara's apartment years ago when K.D. and Applicant came back from a convenience store, and she stated that "when they came back [K.D.] had a bag of candy" that she threw on the ground in an angry manner. Later, K.D. confirmed to Lynette that she was angry because "[Applicant] had touched her in the car when they went to the store." Finally, Lynette overheard a conversation between Sheila and K.D. while K.D. was living in a shelter. During that conversation, Lynette believed that K.D. asked to move in with Sheila because she heard Sheila lie and tell K.D. that "she was living with a friend in Pasadena and that the woman didn't want K.D. to come live with her." But Lynette stated that Sheila was living with her at the time, and that she would have welcomed K.D. into her home. She further stated that Sheila told her that she did not want K.D. to know where she was living. Based on all of this, Lynette concluded her affidavit by stating,

> In my opinion, Sheila doesn't care about [K.D.] as a daughter and [K.D.] is desperate for the love of a mother from Sheila.

Although it is not clear why Lynette was not called as a witness to testify at the live evidentiary hearing, no statements contained in her affidavit were contradicted by another

witness, except Sheila's claim that K.D. did not want to live with them and instead preferred living at a shelter. Also, no witness disputed that she was a close family member with knowledge about the family or implied at any point that Lynette had any motive other than K.D.'s well being. Finally, as noted previously, the habeas court never made a finding of fact with respect to the credibility of the affidavit, nor did the court even acknowledge its existence.

## V. The trial

We now turn to the evidence adduced at Applicant's trial before weighing Applicant's newly discovered evidence against the other inculpatory evidence offered at trial to determine whether Applicant met his burden to prove he is actually innocent of the crime. K.D. testified that, before Applicant came to live with them, she and Sheila "never did see eye-to-eye with each other, but me and [Barbara], . . . she was, like, the one that did mostly everything for me, and so that's . . . why I always looked to her as like a mother to me." She also testified that, after Applicant came to live with them, Sheila would be nice to her when Applicant was around, but when he was not around, she would "go back to being mean . . . ." And she stated that when Applicant first moved in, she liked him a lot because he was nice and comfortable to be around because he was "like a protector" and that he would stand up for her during "neighborhood issues." She also stated that he would do "pretty much anything [she] wanted[,]" including buying her candy.

K.D. then testified about the night of incident, Thanksgiving 2004. That night, a

number of people came over for dinner, including her Uncle Gregory and his wife, as well as other cousins and friends. K.D. thought that there were about 12 or 13 people present in total. After everyone ate dinner, they sat around "talking and stuff, then they left." After the guests left, K.D. stated that just she, Barbara, Applicant, and Sheila remained at the apartment. At some point, Barbara went to bed and K.D. went into Sheila and Applicant's room to watch television. K.D. was sitting on the floor next to the bed, while Applicant and Sheila were both lying on the bed. At some point, Applicant sat down next to K.D. and began to rub her back and arms in a manner that made her "uncomfortable." K.D. testified that her mother was still lying on the bed at this time, but that she did not know whether she was actually asleep or not.[6] Applicant then began to ask K.D. about her future plans and having turned twelve years old on November 19. K.D. stated that she remembered the conversation because they had never had those kinds of conversations previously. After talking with K.D., Applicant reached his hands under her clothes and began to fondle her genitals and told her in a low voice, "almost like a whisper," "[T]his is going to be between me and you . . . ." K.D. then felt Applicant "undoing" her capris, pull them down to her ankles, and start fondling her vagina through her underwear. He then reached under her underwear and inserted "his fingers" into her vagina. After he stopped molesting her, K.D. left the bedroom and went to the bathroom

---

[6]Later during K.D.'s direct examination, the State asked her if she suspected that her mother was awake during the sexual assault in the bedroom, and K.D. responded that, although she didn't know for sure, she suspected that Sheila was awake.

to cry. She also testified that she kept a little knife in the bathroom under the sink and she began cutting herself to try to "[t]ake away [her] pain."

After leaving the bathroom, K.D. was sitting on the couch and feeling disgusted "[b]ecause of what he did, because I really thought that I could trust him, and [Applicant] . . . proved to me that I couldn't . . . ." Then, later, as she was watching television on the couch in the living room, Applicant entered the room and sat next to her. K.D. moved away from him, but Applicant told her "not to move away from [him]." He then pulled K.D. next to him and starting kissing her. K.D. remembered that he put his tongue in her mouth while he was kissing her and that his mouth smelled of cigarettes and alcohol. Applicant then laid K.D. down on her back on the couch and got on top of her. Once on top of her, he pulled her pants down again, put one hand over her mouth, and inserted his penis into her vagina. K.D. testified that she knew it was his penis because of the difference in size she felt in relation to when he inserted his fingers into her vagina. She also stated that it was painful when he inserted his penis into her vagina, and that she could not scream because he was covering her mouth with one of his hands. When asked why she did not tell anyone what happened that night or after the incident was over (until the outcry), K.D. responded that she feared that her mother would not believe her "[b]ecause [Applicant] used to brainwash her."

On cross-examination, defense counsel asked K.D. about her relationship with Sheila, and K.D. testified that she first started becoming angry with Sheila "[b]ecause I felt that she knew about the way [Applicant] was treating [me], and she didn't do

anything about it." She went on to explain that she was mad at Sheila because,

> once everything started happening I didn't really want to have anything to do with him but she would still force me to be around him, like, if he wanted to go to the store to get something he was, like, if you going to get anything you going to come because if you don't I'm not going to get it. So then after that that's when she would tell me go ahead and go with him and stuff and I would tell her I don't want [to] and she would still make me go.

Defense counsel then asked K.D., "If you don't tell Sheila about that then how does she know something is going on?" K.D. responded that any mother "would know if their child is acting a certain way around a person. If they [were] all nice and want to be around them all of the time and all of the sudden they stopped, then a mother would know something is wrong, but obviously she didn't care about that."

Christina Carson was the counselor at K.D.'s school she cried out to in April 2007. Carson was not K.D.'s assigned school counselor, and she initially met with K.D. at the request of a concerned teacher who noticed K.D.'s demeanor had changed and that she was crying unexpectedly. Carson testified that she knew K.D. to be "a happy-go-lucky student, real respectful and mannerable." However, Carson also stated that K.D. told her that she was being bullied at school after she had sex with a popular male student who then maliciously boasted about it "as though [she] was just another notch on his belt loop of taking someone else's virginity." According to Carson, this male student was well known for having done the same thing to other girls at the school. After learning that K.D. was sexually active, and following the standard school protocol when dealing with such a student, Carson asked K.D. about her sexual history. In response, K.D. revealed to

Carson that her first sexual experience was with Applicant and that he "put his hands in between her legs and had put his penis inside of her" when she was twelve years old. Carson immediately notified law enforcement and K.D.'s uncle, Gregory, whom she was living with at the time of her outcry. Following an investigation, Applicant was arrested and charged with aggravated sexual assault of a child, to which he pled not guilty.

K.D. was subsequently taken to the Fort Bend Children's Assessment Center for a forensic interview. Mary Ann Reinke, who conducted the interview, testified that K.D. was "talkative" and "bubbly" at first, but that her demeanor changed when K.D. began to talk about the abuse. For example, K.D. cried and found it difficult to talk about the rape. Reinke also testified that, based on her experience and training, she had no reason to believe K.D. was lying because of K.D.'s ability to tell the story of the rape with such consistency and with specific sensory details.

K.D. also began visiting Nicole Turner, a therapist who specialized in counseling child-abuse victims. K.D. met with Turner about once a week from April 2007 to August 2008. Turner also testified that K.D. maintained consistency with her story throughout the applicable time period, which Turner believed would have been hard to do if a child were lying. And according to Turner, K.D. displayed the usual symptoms of a child who had been psychologically traumatized by sexual abuse, and Turner was not aware of any reason to believe K.D. had an ulterior motive to make up the accusations.

Gregory testified that Barbara raised K.D. and was the head of the household while she was alive. He also testified that Barbara lived in apartments and would move around.

With respect to the night of the incident, Thanksgiving 2004, Gregory stated that he and his wife went to Barbara's apartment for dinner. Barbara, K.D., Gregory, his wife, Sheila, Sheila's children, Applicant, and some family cousins and friends were all present that night, and they played cards and "different things like that." But Gregory testified that he and his wife did not stay the night, and that he could not definitively say who spent the night at Barbara's apartment that night.

On cross-examination, Gregory also testified at length about the acrimonious relationships between K.D. and Sheila, and Gregory and Sheila in regard to K.D.'s upbringing after Barbara passed. For example, Gregory testified that around June 2006, K.D. called him from one of Sheila's friend's houses to ask Gregory to pick her up, and since that time K.D. has lived with Gregory and his wife. For a short time after K.D. began living with Gregory, Sheila wanted K.D. to move back in with her, but after a month or so she stopped asking. Gregory also testified that he had concerns about K.D. living with Sheila because he did not believe that K.D. was being forced to attend school, that K.D. was not being properly restricted in her behavior, and that she was not being looked after properly. He stated that his concern about her attendance at school was because K.D. failed a grade due to lack of attendance "because [Sheila] wouldn't wake her up to get her ready for school." When asked whether K.D. ever wanted to visit Sheila, Gregory responded that she did because K.D. "felt a loyalty there[,]" but that he would not allow K.D. to visit Sheila because he knew that Sheila had "always been jealous of [K.D.]." He gave an example to explain why he believed that Sheila was "very jealous" of

K.D.: "If my mother would try to purchase [K.D.] something . . . , [Sheila] would get upset about it, because my mother adopted her, but she allowed her to call Sheila mother . . . ." He also stated that he believed that Sheila's jealousy of K.D. affected the way Sheila treated the allegations in this case.

Later, defense counsel showed some pictures to Gregory with the purpose of impeaching K.D.'s testimony that Sheila's children were not at the apartment the night of the incident. Gregory agreed that the pictures were taken the night of Thanksgiving dinner in 2004 and that Kedrick and LaGarrin were in some of the pictures. However, he also testified that the pictures were taken earlier in the evening when people were still there, and that because he and his wife left the apartment when everyone was still awake, he could not say whether Kedrick and LaGarrin slept in the living room that night.[7] Defense counsel also questioned Gregory about K.D.'s behavior since moving in with them in June 2006. Specifically, defense counsel asked Gregory about an incident when "one morning [he] found a little teenage boy 15 years old in her bedroom." The time was approximately 5:30 a.m. Gregory testified that K.D. was deceptive when she first moved into his house and that K.D. had lived with them for five or six months before the incident with the boy happened. He also stated that he was "very upset" about the incident. Defense counsel then asked Gregory whether he knew that the boy he caught K.D. with

_____

[7]Defense counsel's argument was that Kedrick and LaGarrin, if they slept at the apartment the night of Thanksgiving 2004, would have been present when Applicant purportedly sexually assaulted K.D. on the couch after the bedroom incident.

was the same boy who claimed to have taken her virginity, and he replied that that was "very new to me." Defense counsel concluded his cross-examination of Gregory by returning to the topic of whether K.D. was manipulative and capable of lying. Gregory agreed that K.D. did let the boy in her room and that she was manipulative when she first moved in with Gregory and his wife, but he denied that K.D. would lie about something like accusing one of her brothers (Kedrick) of sexually assaulting her.[8]

After the incident with the boy in her room, issues at school related to the boy, and the allegation against Kedrick were brought up, the State recalled K.D. to the stand. K.D. agreed that she had let the boy into her room, and that the rumor going around school was about him and her "messing around." She also testified that the other girls were mad "because [K.D.] was talking to him," so they devised a plan to start rumors about K.D. and the boy. Originally, K.D. went to see Carson, a counselor at her school, because she was upset about the rumor situation, but she later told Carson that Applicant had sexually abused her. K.D. testified about the allegation against Kedrick and other instances of inappropriate sexual touching by Applicant when she rode with him alone to the store. She also clarified that, Thanksgiving night of 2004, LaGarrin and Kedrick left the apartment for the night after her Uncle Gregory did. When asked about her relationship with Sheila, K.D. explained that she did not think that Sheila would believe her if she told her what Applicant had done because "[s]he was too in love with him. She left her own

---

[8]After crying out about Applicant, Carson asked K.D. if anyone else had ever touched her inappropriately, and she responded that her brother Kedrick had.

family just [to] be with him."

After the State rested its case, the defense called Kedrick and then his mother Sheila to the stand in Applicant's defense. Kedrick testified that, as the older brother, he was the man of the house, but there was a time that he and his brother were "not going in the right direction." Specifically, he stated that they were "catching on with wrong crowds of people, hanging out at all times of night, [they] started hanging with gang members and stuff like that." However, after Applicant came to live with them, he "tried to show us the right way. He started being the father figure that we didn't have in the household." When asked about Thanksgiving night of 2004, Kedrick testified that Applicant left after dinner about the same time that Gregory and his wife left, and that he did not return that night. He also testified that he and his brother stayed at the apartment the entire day and night, and that K.D. had problems growing up, including running away for days at a time.[9] He also denied sexually assaulting K.D. On cross-examination, the State asked Kedrick about a number of things, including being a deacon at his church, working for a pastor, and being responsible. However, Kedrick admitted that he was no longer with his "baby's momma" and that he had pled guilty to assault with family violence for assaulting her while she was pregnant with his child.

Sheila testified that her relationship with K.D. began to deteriorate after Applicant

---

[9]Kedrick stated that, although he and his brother often stayed overnight at their friends' places, Applicant and his mother had put a stop to it by the time of the incident and that he remembered being home that night.

moved into the apartment because Sheila was more strict with K.D. She also testified, after looking at the same pictures from Thanksgiving 2004, that Applicant left the apartment and did not sleep there that night. She also stated that, while the children were cleaning after dinner, Barbara had already gone to bed and Sheila went to take a shower before going to bed. Sheila was adamant that K.D. slept with Barbara that Thanksgiving night and that K.D. never went to Sheila and Applicant's bedroom to watch television with her. Sheila also discussed how K.D. began to rebel against her authority even more once a letter written by K.D. was found,[10] and as a result, her freedom of movement was restricted to minimize the amount of time she would be by herself.

On cross-examination, Sheila stated that K.D. was not held back a grade in school while in her custody, and that all of her children always attended school properly. But she also testified that neither of her biological children finished high school, and other record evidence showed that K.D. had been held back one grade while in Sheila's custody. The State also asked Sheila whether she loved Applicant and whether she believed that Applicant could have sexually assaulted K.D. Sheila responded that she loved Applicant at one time, and that, to her knowledge, he could never do something like that. The State repeatedly probed Sheila about how she could simultaneously believe that Applicant could not have sexually assaulted K.D., but also not believe that K.D. was lying when she accused Applicant of sexually assaulting her. Ultimately Sheila stated, "I don't think it

---

[10]The contents of the letter were excluded by the trial court, but it appears that the letter described something sexual in nature.

happened, ma'am, no, I don't." But when the State followed up by asking, "So you think [K.D.]'s a liar?" Sheila responded "I didn't say she was a liar. I'm not going to say that."

## VII. ANALYSIS

### A. The evidence presented was newly discovered but not credible.

The parties do not dispute that K.D.'s initial recantation took place when she wrote her affidavit after Applicant had exhausted his appeals. Therefore, we agree with the parties that Applicant's evidence is newly discovered evidence for purposes of his *Herrera* actual-innocence claim. *Elizondo*, 947 S.W.2d at 206 (requiring "newly discovered" evidence to assert a *Herrera* actual-innocence claim); *Tuley*, 109 S.W.3d at 403 (discussing when evidence is newly discovered). However, after independently reviewing the habeas record in this case, we cannot agree with, and do not adopt, the habeas court's findings that Sheila's testimony at the evidentiary hearing was credible, or that K.D.'s affidavit, videotaped deposition, and certain individual statements plucked from the habeas record were credible but that others were not. We also do not adopt the habeas court's finding that K.D.'s trial testimony was not credible. Significant objective evidence from the habeas record supports a finding that Sheila testified untruthfully at the evidentiary hearing and that K.D.'s recantations and stories explaining why she recanted were internally inconsistent, implausible, and portions of them factually impossible. The stories that she told in various forms throughout the postconviction proceedings were also contradicted by the testimony adduced at Applicant's trial. For example, the genuineness

of K.D.'s outcry was supported by a number of witnesses at trial, and those witnesses's

testimony was, at best, only implicitly impeached by Applicant's presentation of K.D.'s

several and inconsistent alleged recantations. Witnesses at trial also testified that Sheila

did not have a good relationship with K.D. and that she was jealous of K.D. because

Sheila believed that her mother gave more attention to K.D. than to her, Barbara's natural

daughter. And although Sheila claimed that she was not jealous of K.D., other testimony

at trial and in the habeas record supported K.D.'s version of events at trial. Sheila testified

at trial that her relationship with K.D. began "deteriorating" as early as when Applicant

moved in with them. Moreover, Sheila testified on behalf of Applicant at the trial that she

did not believe K.D.[11]

---

[11]We also note that there are other inconsistencies and unsupported assertions in the habeas court's findings of fact. For example, in the section of the habeas court's findings of fact and conclusions of law discussing the applicable standard of review for a *Herrera* claim, the habeas court states that "[t]he Elizondo case is uniquely on point here as[ . . . ]both involved a childhood accusation of sexual assault that was later recanted when the child became an adult." Although not technically listed as a finding of fact or conclusion of law, we feel it is necessary to address this conclusion. A cursory review of the evidence in this case and this Court's opinion in *Elizondo* reveals that the facts of *Elizondo* are distinguishable on their face.

In *Elizondo*, the applicant, who had been convicted of aggravated sexual assault, raised a *Herrera* claim alleging that he was actually innocent of the crime because new evidence, including a recantation by the complaining witness, proved his actual innocence. *Elizondo*, 947 S.W.2d at 204. In addressing the applicant's claim, we explained that the only inculpatory evidence in that case was "based solely upon the testimony of [the applicant's] step-son" who was one of the alleged victims. *Id.* at 209. And this was despite the fact that the jury heard two hearsay reports of the step-son's allegations from his step-mother and the police officer dispatched to investigate the original complaint, and the jury saw a sexually explicit picture and a sexually suggestive note drawn and written, respectively, by the victim. We reached this conclusion, in part, because "the drawing nor the note actually intimated that the child had been sexually abused or assaulted, either by applicant or by any other person." *Id.* at 210. And we further concluded that both the complainant and his brother, who did not testify at the trial, alleged that the testimony given by the complainant thirteen years earlier at the applicant's trial was false. *Id.* Both children cited their natural father as the reason for the false allegations

### B. Applicant failed to prove his actual innocence by clear and convincing evidence.

Having determined that Applicant presented new evidence and what that evidence is, we now must weigh Applicant's new, exculpatory evidence against the evidence adduced at trial to determine whether Applicant has proven by clear and convincing evidence that no rational jury would have convicted him in light of the new evidence.

The sheer number of "back and forth," inconsistent stories leads us to conclude that Applicant cannot meet the minimum quantum of proof necessary to satisfy Applicant's "Herculean" burden to unquestionably establish his actual innocence by clear and convincing evidence. Newly discovered evidence that merely "muddies the waters" and only casts doubt on an applicant's conviction, such as the multiple recantations and

---

because he "relentlessly manipulated and threatened them into making such allegations against applicant to retaliate against their natural mother, his ex-wife, for marrying applicant years before." *Id.*

Thus, although the child complainant in *Elizondo* made allegations of sexual assault and recanted, he recanted only once and fully, and the complainant's recantation was supported by his brother's consistent statement, based on personal knowledge, that the complainant's trial testimony was false. Further, at trial, the only other inculpatory evidence was the statements of the complainant, introduced at trial through his step-mother and the investigating police officer. *Id.* at 209. In the instant case, K.D. changed her story three times, and there was no other individual to attest to the veracity of her several and different recantations. Moreover, in Applicant's trial, and unlike in *Elizondo*, the State called a number of witnesses who supported the circumstances of K.D.'s sexual-assault outcry as genuine, and some of those witnesses were experts in the area of child psychology and counseling and were trained to identify false sexual-assault outcries. Moreover, Applicant has relied solely on the times that K.D. has recanted to meet his burden to prove that he is actually innocent by clear and convincing evidence. However, despite that the burden is on Applicant, he did not call any witness or proffer any evidence that would cast doubt on the State's expert witnesses at trial, other than possibly implicitly challenging their testimony through the recantation of the complainant. Therefore, it was erroneous to conclude that "[t]he Elizondo case is uniquely on point here" because, although both cases involve claims of sexual assault made by children and that were later recanted, the similarities largely end there.

repudiations in this case, is insufficient to prevail in a free-standing actual-innocence claim because that evidence does not affirmatively establish an applicant's factual innocence by clear and convincing evidence. *See Elizondo*, 947 S.W.2d at 209.

## VIII. Conclusion

Although Applicant presented newly discovered evidence that, if true, would have possibly established his actual innocence, because he has not shown that his newly discovered evidence is credible, and because of the multiple recantations and repudiations, he cannot prove by clear and convincing evidence that no rational jury would have convicted him in light of the newly discovered evidence. Therefore, we deny relief.

Hervey, J.

Delivered: May 14, 2014

Publish