78,545-02

# SCHNEIDER & McKINNEY, P.C.
## ATTORNEYS AT LAW
440 Louisiana, Suite 800
Houston, Texas 77002
(713) 951-9994
Telecopier: (713) 224-6008

Stanley G. Schneider ⊕ ♀
W. Troy McKinney ⊕ ‡ ♀
Thomas D. Moran

⊕ Board Certified Criminal Law- Texas Board of Legal Specialization
♀ Board Certified Criminal Appellate Law - Texas Board of Legal Specialization
‡ Board Certified DWI Defense - National College for DUI Defense

September 2, 2015

**Via Certified Mail**
**Return Receipt Requested**
**No. 7014 2120 0002 7340 3712**

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 04 2015

Abel Acosta, Clerk

Honorable Abel Acosta, Clerk
Texas Court of Criminal Appeals
P.O. Box 12308
Austin, Texas 78701

> Re:   Ex parte David Mark Temple
>        No. WR-78,545-02
>        Trial Court No. 1008763-A

Dear Mr. Acosta:

As a courtesy to you, enclosed please find 10 copies of Applicant's Request That The Trial Court Enter Amended Findings of Fact and Conclusion of Law which were filed in the trial court on August 28, 2015. As always, your cooperation and assistance is appreciated.

Sincerely,

Stanley G. Schneider

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| DAVID MARK TEMPLE | § | 178TH DISTRICT COURT |

## APPLICANT'S REQUESTS THAT THE COURT ENTER AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court entered Findings of Fact and Conclusions of Law on July 6, 2015, without the benefit of the record from the habeas hearing that lasted 26 days and included 292 exhibits that totaled over 5000 pages. Prior to the entry of this Court's Findings, the State and Applicant responded to questions propounded by the Court without the benefit of the record. Applicant has reviewed the Court's factual findings and identified portions of the record that provide the actual factual basis for them. Applicant requests that this Court amend its Findings of Fact and Conclusions of Law to reflect the record.

Attached hereto for the convenience of the Court is a suggested amended Findings of Fact and Conclusions of Law that is annotated with citations to clerk's record, the reporter's record and the habeas record including testimony and exhibits. The annotations and commentary are bold and bracketed. The commentary is limited to correct a fact that is not accurate for example only 15 witnesses testified before the 1999 grand jury and not 30 as set out in the findings.

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 04 2015

Abel Acosta, Clerk



Further, Applicant has attached a disc that contains a PDF file that is hyperlinked to the record so that the Court can facilitate review. The disc also contains the findings in word format as well as a document with directions as to how to use the hyperlinked documents.

Applicant requests that the Court adopt the amended findings and file them with the Harris County District Clerk and order that the amended findings and the accompanying disc forwarded to the Court of Criminal Appeals.

Wherefore premises considered, Applicant prays that this Court enter the amended Findings of Fact and Conclusions of Law.

SCHNEIDER & McKINNEY, P.C.

STANLEY G. SCHNEIDER
T.B.C. No. 17790500
440 Louisiana
Suite 800
Houston, Texas 77002
OFFICE: 713-951-9994
FAX: 713-224-6008
EMAIL: stans3112@aol.com

ATTORNEY FOR APPLICANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the attached and foregoing document

has been served on the Harris County District Attorney's Office by delivering same to 1201

Franklin, Houston, Texas 77002, on this 28th day of August, 2015.

STANLEY G. SCHNEIDER

3

# INDEX

1.    Annotated Temple Findings (Citations Only)

2.    Annotated Temple Findings (Citations with Additional Support)

3.    CD with Annotated Findings (PDF with linked sources and sources file)

# 1. Annotated Temple Findings (Citations Only)

No. 1008763-A

IN THE 178TH DISTRICT COURT OF

HARRIS COUNTY, TEXAS

EX PARTE

DAVID MARK TEMPLE

FINDINGS OF FACT AND

COUCLUSIONS OF LAW

**INTRODUCTION**; The defendant was convicted by a jury of the murder of his wife, Belinda Temple, and sentenced to serve life in the Department of Corrections. The Defendant appealed and the conviction was affirmed by the 14th Court of Appeals. Temple v. State, 342 S.W.3rd 572 (2010); The Defendant appealed that decision to the Texas Court of Criminal Appeals which also affirmed his conviction and sentence. Temple v. State, 390 S.W.3d 341 (2013).

The defendant then subsequently filed this application for writ of habeas corpus. The defendant has advanced the following claims for relief:

1.  The State suppressed evidence favorable to the Defense in violation of Kyles v. Whitley, 514 U.S. 419 (1995) and Brady v. Maryland, 373U.S. 83 (1963).

2.  The State suppressed evidence that would have impeached the trial testimony of Riley Joe Sanders and Detectives Schmidt and Leitner in violation of United States v. Bagley, 473 U.S. 667 (1985).

3.  The Trial Court failed to disclose Grand Jury testimony favorable to the Defendant.

1

4. The Defendant received ineffective representation from his trial counsel for failure to use information from the Defendant's father regarding the time available to the Defendant to commit the offense.

5. The Defendant received ineffective representation from his trial counsel for failure to get a continuance during trial.

6. The Trial Court deprived the Defendant of the right to investigate exculpatory evidence regarding an alternative suspect.

7. The Defendant is entitled to a new trial based on newly discovered evidence.

8. The Defendant is actually innocent.

Many of these claims were raised in one fashion or another during the direct appeals of this case. The Court of Appeals decision involved 61 pages and virtually all of them were devoted to discussions of the facts of this cause.

The opinion of the Court of Criminal Appeals with much smaller print was on 23 pages and virtually the entire opinion dealt with intensive factual analysis. Those two opinions highlight the critical nature of the facts of this case. The testimony is incredibly complex and intertwined.

The investigation of this murder involved over 400 single spaced investigator's reports. Over 30 witnesses appeared before the Grand Jury in the following months but no indictment was returned. **[WR32, DX-94-112, "Grand Jury Subpoenas"; WR32, DX-92, "Grand Jury List of Witnesses"]**. 5 years later the trial prosecutor took responsibility of the case and she had the Defendant arrested. **[CR1, P.3, "Complaint"]**. Then 2 years

2

later, the Defendant was indicted by a Grand Jury which apparently heard no witnesses. **[CR1, P.17, "2/28/2005 Indictment"].** The trial lasted for several weeks with the jury finding the Defendant was guilty beyond a reasonable doubt. The trial testimony was circumstantial and very fact specific, which lends some credibility to the current Defense claim that critical exculpatory evidence was not disclosed.

The lead Prosecutor at trial was Kelly Siegler and the lead Defense Counsel was Dick DeGuerin.

One of the major grounds on direct appeal dealt with a claim that the trial prosecutor had engaged in misconduct to such a degree that it denied the Defendant a fair trial. The claim was rejected by the Appellate Court, holding: "During the emotionally charged four week trial, the prosecutor occasionally exceeded proper questioning and argument when attacking the credibility of appellant and his family and also apparently disobeyed or ignored a few of the trial court's rulings. While we certainly condemn such tactics, in light of the whole record, we cannot conclude that these errors were so prejudicial, or so inflamed the jury, that appellant was deprived of his substantial rights or a fair trial."

The Court of Criminal Appeals held that the circumstantial evidence was sufficient to support the conviction. But specifically, the Court held; "Appellant argues that the evidence showing that Riley Joe Sanders, III had motive, opportunity and access to a 12-gauge shotgun should have received more weight in the Court of Appeals analysis. The pertinent information about Sanders was presented to the jury, including

3

his activities on the day of the murder and his use of shotguns. Additionally, Sanders himself testified. Appellant had the opportunity to cross-examine him, and the jury was able to assess his credibility. Furthermore, the jury also heard testimony that Sanders was repeatedly questioned and that the law enforcement officers were satisfied by his responses. It is the province of the jury to assess the credibility and demeanor of the witness. We are not the fact finders, and neither was the court of appeals. Further, it is not the State's burden to exclude every conceivable alternative to a defendant's guilt. Therefore, we hold that the evidence was sufficient to support Appellant's conviction for murder. The jury was rationally justified in finding Appellant guilty beyond a reasonable doubt."

It is thus apparent how critical the Defendant's current claims are. In the 2 and ½ month hearing conducted by this habeas Court, some things were absolutely clear. The lead prosecutor and the Defendant's lead attorney had a personal and contentious relationship and a professional battle of the highest degree. Both were famous and neither could stand losing to the other. Of enormous significance <u>was the prosecutor's</u> <u>testimony at the habeas hearing that apparently favorable evidence did not need to be</u> <u>disclosed if the State did not believe it was true.</u> **[WR7, P.249-50, 255-57].**

The Prosecutor also testified that although a large number of investigators were involved, she only elected to call a small number because she did not want the defense lawyer to have access to their offense reports. **[WR8, P.97-101; WR31, DX-89 "Siegler Subpoena List"].** At the time of this trial, the State was only obligated to provide offense reports after a law enforcement officer had testified. **[WR11, P.26, L.23-25**

4

Holtke (WR30, DX-29) Leitner (WR30, DX-31) Shipley (WR30, DX-32) and Schmidt (WR30, DX-33); WR12, P.15, L.16-20; WR11, P.84].

The Prosecutor indicated that some exculpatory evidence was tendered to the defense in the middle of the trial. This gave the defense attorney little time to digest much less investigate that evidence. On one occasion, the defense did ask for a continuance for this purpose but the request was denied by the trial judge.

The hearing conducted in this Court involved the lengthy examination of over 30 witnesses and over 200 exhibits [WR1, 14-33], many of which were extensive and complex. Both the State and Defendant were permitted to tender proposed factual findings and arguments, and based on the testimony and exhibits, the Court hereby makes the following findings of facts and conclusions of law with regard to the Defendant's claims:

## FINDINGS OF FACT - INEFFECTIVE TRIAL REPRESENTATION

The Defendant now claims that his trial counsel, Dick DeGuerin was legally ineffective to the extent that he was deprived of appropriate representation. The Court hereby finds as facts:

1. Defense Counsel did not use Charles Kenneth Temple's written statement timeline.
2. Defense Counsel did file a Motion For Continuance when additional evidence was disclosed during trial by the Prosecutor. That Motion was denied by the Trial Judge. Defense Counsel did not urge another Continuance.

5

3. On direct appeal, the Appellate Court found that Trial Counsel waived any Brady claim based on the untimely motion for continuance and Counsel's failure to timely object at trial.

4. Trial Counsel received over 300 pages of offense reports **[Holtke (WR30, DX-29) Leitner (WR30, DX-31) Shipley (WR30, DX-32) and Schmidt (WR30, DX-33)]** to digest during trial, including portions dealing with the investigation of Sanders and his friends but made no objection regarding the large number of things that needed to be investigated. **[WR13, P.216, L.23-25; WR11, P.29-30; TR25, P.5-14].**

## CONCLUSIONS OF LAW – INEFFECTIVE REPRESENTATION

Strickland v. Washington, 466 U.S. 668 (1984) sets out the standards that apply to claims of ineffective representation. See also Smith v. State, 286 S.W.3d 333 (Tex. Crim. App. 2009); Lopez v. State, 343 S.W.3d 137 (Tex. Crim. App. 2011). The defendant is not entitled to errorless counsel but rather to objectively reasonable representation.

To be entitled to prevail on a claim of ineffective representation, the defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. The second test must be sufficient to show that there was a probability sufficient to undermine confidence in the trial outcome to the degree that but for counsel's deficient performance, the result of the proceedings would have been different. Hernandez v. State, 726 S.W.3d 53 (Tex. Crim. App. 1986).

6

Trial counsel's performance was not perfect but much of the difficulty he faced was driven by a constant resistance of the trial prosecutor to reveal necessary information. Trial counsel continued to seek helpful information from the prosecutor but little was disclosed prior to trial. While substantial information was disclosed by the prosecutor during the trial, it was literally impossible for trial counsel to sufficiently investigate, verify or dispute the disclosures. In most instances, defense counsel was permitted to read documents and take notes but was not given copies.

**The defendant's current claim that trial counsel provided ineffective representation has not been shown to meet the <u>Strickland</u> requirements and relief on this basis is not justified.**

### <u>FINDINGS OF FACT - ACTUAL INNOCENCE – NEWLY DISCOVERED EVIDENCE</u>

Some years after the conviction, Trial Counsel was contacted by Daniel Glasscock. Counsel took a sworn statement from Glasscock as well as a video recording. Glasscock passed a polygraph administered by the Harris County District Attorney's Office and retold his story a second time to DA Investigator Steve Clappert. Glasscock also testified at the habeas hearing conducted by this Court. The Court finds as a fact:

1. Glasscock told Trial Counsel that he overheard a conversation of Sanders shortly after the murder of Belinda Temple. Sanders admitted shooting his shotgun during the burglary of his neighbor's house. **[WR28, DX-1 "Oral/Videotaped Deposition of D. Glasscock"].**

7

2. In subsequent statements given to this Court as well as Prosecutors, Glasscock substantially varied the facts originally given to Trial Counsel. In substance, Glasscock repudiated the most important details to the extent that his future credibility as a witness is significantly impaired. **[WR28, SX-78 "Transcription of D. Glasscock's Statement"; WR28, SX-79 "CD-D.Glasscock's Statement" (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT79.mp3.); WR28, SX-80 "Transcription of Clappart's interview of D. Glasscock's statement"; WR28, SX-81 "Recorded Conversation of D. Glasscock" (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT81.mp3.); WR28, SX-83 "Recorded conversation of D. Glasscock" (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT81.mp3.); WR28, SX-84 "Recorded conversation of D. Glasscock (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT84.mp3.)].**

## CONCLUSIONS OF LAW – ACTUAL INNOCENCE-NEWLY DISCOVERED EVIDENCE

The defendant is required to establish by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. Ex Parte Navarijo, 433 S.W.3d 558 (Tex. Crim. App. 2014). In order to determine whether the defendant has met this standard, the court must examine the new evidence in light of the evidence presented at trial. Ex Parte Thompson, 153 S.W.3d 417 (Tex. Crim. App. 2005); Ex Parte Elizondo, 947 S.W. 207 (Tex. Crim. App. 1996).

8

A person claiming actual innocence must show that the new evidence creates a doubt as to the correctness of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different on retrial, Ex Parte Holloway, 413 S.W.3d 95 (Tex. Crim. App. 2013) and that no reasonable juror would have convicted him in light of the new evidence.

Further, the defendant has a "Herculean task" when urging a new trial because of newly discovered evidence. Ex Parte Harleston, 431 S.W.3d 67 (Tex. Crim. App. 2014). This is because once the defendant has been afforded a fair trial and convicted, the presumption of innocence disappears and it is entirely appropriate to apply an extraordinarily high standard of review. Herrera v. Collins, 506 U.S. 390 (1993).

**The new evidence provided by Glasscock does not meet this high standard even the version of his original statement to Dick DeGuerin. It further fails in light of his recanting much of his original statement. The defendant has not met the "Herculean task" required, and relief based on actual innocence is not justified.**

## FINDINGS OF FACT - EXCULPATORY EVIDENCE

The Court finds that trial prosecutors either intentionally, deliberately or negligently failed to disclose the following facts to the defendant or disclosed the facts during the actual

9

trial that prevented the defendant from fairly being able to timely investigate or effectively use the evidence "irrespective of the good faith or bad faith of the prosecution" <u>Brady v. Maryland</u>, supra:

1. The report prepared by Dep. Hernandez concerning recovery of the H & R shotgun was lost, destroyed or never prepared, showing when, how, where and from whom the weapon was obtained. **[WR5, P.76-84; WR12, P.127-30, 169-70, 202-15; WR29, DX-3, Bates 450; WR29, DX-3, Bates 460 "Holtke's Offense Report"; WR26, SX-17 "Pasadena Lab Report"; SX-18 "HCSO Supplement Report"; SX-19 "HCSO Report"; WR30, DX-4, "Leithner's Supplement Report"]; [WR11, P.34]; [WR11, P.35].**

2. Natalie Scott told investigators that the victim was having problems with a student and that she was worried that he knew where she lived. **[WR29, DX-3, Bates 101-02, "Page Offense Report 1/12/99"].**

3. Riley Joe Sanders was interviewed by 7 different officers on 6 days. After Sanders testified, the State did not disclose his oral statements **[WR7, P.241; WR9, P.225]** from Jan. 11, 1999 **[WR29, DX-3, Bates 51-52]** Jan. 12, 1999 **[WR 29, DX-3, Bates 89]**, Jan. 14, 1999 **[WR 29, DX-3, Bates 77-78, 105]**, Jan. 28, 1999 **[WR12, P.127-30]**, Jan. 29, 1999 **[WR29, DX-3, Bates 250-52]**, Jan. 25, 1999, **[WR29, DX-3, Bates 214-17, "Hernandez Offense Report"]** or Feb. 1, 1999 **[WR27, DX-3, Bates 1939-40]**; nor did the State produce any of the polygraph tests or questions used in the examinations. **[TR25, P.5-14; WR3, P.9, L.10-14; WR9, P.192, L.11–P.194, L.1].**

4. Cody Ellis was interviewed on Jan. 14 **[WR29, DX-3, Bates 149-50]**, 25 **[WR29, DX-3, Bates 214-17]**, and 28 **[WR29, DX-3, Bates 824-26]** 1999, and Feb. 10, 1999 **[WR29,**

**DX-3, Bates 279-80].** On the last occasion he was administered a polygraph test. He never mentioned that he was in possession of Sander's H & R shotgun. Although known to law enforcement, Ellis was never questioned about his hiding the H & R shotgun, later recovered with a spent reloaded .00 buckshot shell still in the chamber; how the weapon came to be wrapped in a blood spotted towel; and the circumstances under which the H & R shotgun left Ellis' possession. **[WR29, DX-3, Bates 838-39 "Statement of Jonathan Pena"; WR32, DX-120, "Statement of Carlos Corro"].**

5. Recorded oral statements of Margaret Christenson **[WR23, P.19, L.14-19]** and Stacy Ferguson, both of which saw the victim in the school parking lot shortly before her murder. **[WR35, DX-179 "Siegler's Handwritten List of Recorded Interviews"; WR35, DX-180 "Audiotapes"; WR23 P.17, L.1-13; WR23, P.21-22; WR23, P.25, L.5-6].**

6. On August 25, 2005 at a discovery hearing, the defendant requested all "documentation of leads of other suspects." **[TR4, P.45, L.20-22].** The Judge ordered disclosure of "any reports, documentation which reports tips, leads as to another person having committed this offense, that's Brady material." **[TR4, P.46, L.3-8 ("That certainly would be - - once again, this is a two-part request. Obviously any reports, documentation which reports tips, leads as to another person having committed this offense, that's Brady material. She has a duty to disclose that to you.")].** The trial prosecutor informed the Court that the police had checked out all of the calls and nothing came of those efforts. **[TR4, P.46, L.20–P.47, L.12].** Relying

on the statement of the prosecutor, the Court denied the request. **[WR30, DX-18, "Affidavit/Partial Transcript of William Harmon"; TR4, P.48, L.5-8].** At that same hearing, the trial prosecutor informed the Court that the weapons recovered had nothing to do with the murder; that they were the wrong type of weapons; and the wrong type of ammunition. **[TR4 P.54, L.20-23].** Finally, the trial prosecutor told the Court that there was no evidence favorable to the defense even though Mrs. had called law enforcement stating that her husband may have killed the victim. **[WR7, P.244-45].** The Cain information was disclosed October 4, 2007, just 11 days prior to the beginning of trial. **[WR23, P.76-77; WR32, DX-118, "Partial Transcript Between Siegler/DeGuerin"; WR29, DX-3, Bates 348].**

7. Although required to disclose by the Court, the trial prosecutor did not disclose evidence of the Parker's dog barking near the time of the murder. **[TR4 P.46-48, "August 25, 2005, Pretrial Hearing"; WR9, P.227-34; WR29, DX-3, Bates 19].** This information was gained by the defendant on October 16, 2007 after the first witness had testified. **[TR9, P.97-102, P.115-17; WR32, DX-117, DX-117A, DX-117B, "Transcripts of Parker Interviews, October 17, 2007"; WR26, SX-25 "Dick DeGuerin Offense Report Notes"].**

8. The State failed to produce prior to trial, the written statements of Cody Ellis, Cody Towner, Michael Gradham, Johathon Pena, Riley Joe Sanders, Casey Goosby **[WR29, DX-3, Bates 263-65]** or Carlos Corro, all of which would have supported an alternative suspect claim. **[WR9, P.225-28; WR12, 195-96].**

9. The trial prosecutor never produced an FBI report which profiled the possible killer.

10. In January, 1999, Riley Joe Sanders was interviewed by Officers Hernandez and Lampson and gave 2 oral statements. [WR12, P.127-130; WR29, DX-3, Bates 250-52, "Leithner Supplemental Offense Report"]. Neither was disclosed. [WR7, P.204, 241; WR9, P.225].

11. On January 28, 1999, Cody Ellis give police a written statement. [WR29, DX-3, Bates 824-26]. He did not reveal nor was he asked about his possession of the H & R shotgun. The written and oral statements were never disclosed. [WR7, P.204].

12. Jonathon Pena gave police a written statement indicating he was present at Casey Goosby's home when Goosby, Cody Ellis and Carlos Corro planned the Heatherington burglary; that shortly thereafter, Riley Sanders brought his H & R shotgun from home to go shooting with them; and Cody Ellis told him later that he was keeping Sanders shotgun under his bed. [WR29, DX-3, Bates 838-39].

13. On Feb. 1, 1999, Carlos Corro gave a written statement to police that he was aware Cody Ellis had been hiding Sander's shotgun under his bed and that he had participated in the Heatherington burglary. [WR29, DX-3, Bates 840-42; WR9, P.188, L.24-25; WR9 P.189, L.1-6].

14. On Feb. 1, 1999, Randall Hess gave a written statement to police. [WR29, DX-3, Bates 836-37]. He indicated that Sanders, Granthom and Towner had come to his house around 3:30 pm on January 11, 1999, looking for drugs and acting goofy as if they were already high. [WR29, DX-3, Bates 251, 257].

15. In January, 1999, Joe Sosa reported that on the day of the murder, Towner and Granthom were at Sander's home at the time of the murder and that if you put a pillow over the muzzle of a shotgun, it would muffle the sound. **[WR31, DX-90, "Schmidt's Offense Report"].**

16. On Feb.1, 1999, Towner is given a polygraph test. The questions asked were never disclosed. **[WR3 P.9, L.10-14].**

17. On Feb. 1, 1999, Granthom gave a written statement to law enforcement and the contents have never been disclosed. **[WR29, DX-3, Bates 251-52; WR32, DX-92 "List of Grand Jury Witnesses"].**

18. On Feb. 10, 1999, Granthom is given a polygraph test and although he was determined to be deceptive, the questions asked were never disclosed. **[WR3, P.9, L.10-14].**

19. On January 12, 1999, Dennis Hundle is interviewed. **[WR29, DX-3, Bates 97].** Not disclosed were his statements that on January 11, 1999, after 2 p.m. he sees 2 white males in their 20's in a truck driving around the neighborhood and it appeared they had no destination.

20. In March, 1999, Corros is arrested with Ellis and Goosby doing "donuts" on the green belt in Katy, Texas and one was driving a white truck. **[WR32, DX-127, "March 16, 1999, Ft. Bend Sheriff's Offense Report"; WR34, DX-141, "July 6, 1999, Katy Police Department Offense Report"].**

21. The State misrepresented the name of Carlos Corro as Carlos Gutierrez. **[TR26, P.198, L.1-13, "Carlos Carrero"; TR26, P.227, L.9-14 "Carlos Gutierrez"; TR26, P.230,**

L.2-5; TR26, P.233, L.23-25; WR32, DX-94 "Table of Contents from the Offense Report with Siegler's handwritten notes"; WR13, P.215-16; WR13, P.196, P.212, L.21–P.214, L.18].

22. The State did not disclose the statement of Margaret Christian who saw the victim talking to the defendant on her cell phone between 3:20 pm and 3:30 pm on the day of her murder. [(TR15, P.159-183; WR23 P.16-17); WR23, P.25].

23. Det. Shipley repeatedly omitted favorable defense facts from her offense reports when she documented "synopses" of audio statements. [WR30, DX-32, Bates 2201 "Shipley's Offense Report"].

24. The main prosecutor denied ever having seen or listened to these audio recordings when in fact she was aware of them and had listened to them. [WR10, P.107-111; WR35, DX-179, "Siegler's Handwritten List of Recorded Interviews"; WR35, DX-180 "Audiotape" (Media filed as DEFENSE.EXHIBIT.180.mp3); WR10, P.111, L.10-15; WR33, DX-129, P.43 "September 5, 2012, Curry email to his home address"; WR33, DX-129, P.234; WR33, DX-129, P.70 "July 29, 2013, Email from Smith to Curry"].

25. The State did not disclose the identity of Denise Lavoris who could have confirmed seeing the victim in the parking lot after school which would have helped the defense timeline. [WR31, DX-89, "Subpoena List"; WR35, DX-180, "Audiotape" (Media filed as DEFENSE.EXHIBIT.180.mp3) "Audiotape" (M. Christenson and S. Ferguson both identify Denis Lavoris in their statements); WR32, DX-114 (Siegler's handwritten notes); WR7, P. 136-138; WR33, DX-129, P.26 (Email from Curry to Siegler)].

15

26. On January 25, 1999, Joe Cadena was interviewed by law enforcement and told them that around 4:25-4:30 pm he heard what sounded like a backfire from a car on the day of the murder. **[WR27, SX-34, "Transcription of Conversation between DeGuerin/Siegler"; WR12, P.223, L.11-15.**

27. The State's theory was that the defendant's dog (Shaka) was in the backyard at the time of the murder. The State did not disclose witness statements from: Jackie and Anthony Mata that the dog had access to the garage **[WR29, DX-3, Bates 95]**; Justin Valdez that the dog had garage access and would act calm around him **[WR29, DX-3, Bates 85]**; and Terry Schultz that the dog had access to the garage. **[WR29, DX-3, Bates 96; WR9, P.82, L.7-8].**

28. Deputy Brian Scudder saw the defendant after the murder with his head in his hands sobbing. **[WR29, DX-3, Bates 17].**

29. Roseanne Martinez reported that the defendant appeared weak kneed after discovering the victim's body. **[WR29, DX-3, Bates 178].**

30. Riley Joe Sanders identified Ryan Bruno's house. In one statement, he indicated nobody was home **[WR29, DX-3, Bates 828]** and in the other statement, that he had stayed five minutes. **[WR27, SX-45A "Sealed document, unsealed during hearing" (RJS Grand Jury Testimony, 4/21/1999)].** Bruno was never interviewed nor was his identity disclosed. **[WR9, P.46-47 (Writ Testimony, K. Siegler); WR29, Bates 1570-1572 (GJ Testimony of M. Granthom)].**

16

31. The State did not disclose the Harris County administrative bulletin indicating that the murder took place between 4:15 pm and 5:30 pm. **[WR29, DX-3, Bates 3, "Case Synopsis"].**

32. During trial, the State failed to produce oral statements to law enforcement of witnesses after they had testified. **[WR7, P.241].**

33. After conviction, the State's main prosecutor instructed law enforcement and District Attorney Officials not to disclose records pursuant to an Open Records request. **[WR32, DX-115, "Siegler Email Chain, November 20, 2007"; WR30, DX-34, "Siegler Email, November 30, 2007"].** Disclosure was made only after these writ proceedings were initiated. **[WR5, P.49-53; WR17, P.66-88].**

34. Years after leaving the District Attorney's Office, the lead trial prosecutor learned that Glasscock had approached Dick Deguerin. **[WR31, DX-79, "Email Report", "Bonds Email July 22, 2012"; WR35, DX-202, P.310 – 7/22/2012; WR33, DX-129, P.437 "7/22/2012].** She then contacted a Sheriff's Deputy involved in the trial investigation **[WR19, P.281-82; WR35, DX-169, "Cell Phone Records of Holtke"]** and asked him to contact Glasscock and another witness **[WR2, P.22-24 (Cody Ellis)]** before they could be contacted by the Special Prosecutor or current members of the District Attorney's Office. **[WR3, P.123, L.19–P.124, L.20; WR30, DX-7, "Affidavit/Arrest Warrant" (for Cody Ray Ellis); WR27, SX-43, "Sgt. Holtke Email to Curry, September 5, 2012"].** The Deputy did so and afterwards, their stories were significantly different than the original version. **[WR27, SX-43; WR34, DX-137, "CD Audio Recording of C. Ellis"; WR35, DX-202, P.249, P.476; WR34, DX-130,**

17

"Cellphone Excel Spreadsheet"; WR35, DX-169, "Cell phone records of M. Holtke". WR27, SX-49, "Holtke Supplemental Report" (2012 Investigation); WR28, DX-1, "Oral/Videotaped Deposition of Daniel Glasscock" (by Dick DeGuerin); WR26, SX-11-12, "Audio Interview and Transcript of Audio Interview of D. Glasscock" (by Steve Clappart); WR30, DX-6, "D. Glasscock Polygraph Report"; WR26, SX-13, "Videotaped Deposition of D. Glasscock"; WR27, SX-51-52, "Clegg's and Minchew's Supplemental Reports"].

35. Additionally, long after leaving the District Attorney's Office, when the original lead trial prosecutor learned of the newly discovered evidence investigation by the Special Prosecutor [WR8, P.16-17; WR33, DX-129, P.291-94, September 11 & 12, Email Exchange b/w Curry and Beers], she personally obtained representation for Riley Joe Sanders from two very talented criminal defense lawyers, Mac Segrest and Chip Lewis. [WR19, P.281-82. WR4, P.77, L.1-12; WR7, P.270, L.11-13. WR33, DX-129, P.291-94, September 11 & 12, Email Exchange b/w Curry and Beers].

36. After the trial, the lead prosecutor Kelly Siegler ran for District Attorney against Pat Lykos and lost. [WR4, P.88]. After her defeat, she left the District Attorney's Office but through friends who remained on the staff, learned that Dick Deguerin had brought the Glasscock information to the new District Attorney for further investigation. [WR19, P.241-47; WR4, P.88-96; WR7, P.274, L.13-15]. A Special Prosecutor was appointed and faced significant difficulty in investigating the validity of Glasscock's claim. [WR7, P.270-71; WR35, DX-202, P.676, "September 10, 2012, Email from Durfee"; WR35, DX-202, P.676; WR35, DX-202, P.676]; WR35, DX-202,

**P.440, "August 17, 2012, Email from Chin"; WR35, DX-202, P.700; WR3, P.122, L.9-15; WR35, DX-202, P.676; WR35, DX-173, August 30, 2012 Email to Alan Curry re: Grand Jury Subpoena; WR35, DX-202, P.698].**

37. Siegler lied to the trial judge about the phone numbers for the Roberts being disconnected. **[TR6, P.7, L.25–P.8, L.8 (Pretrial Hearing October 4, 2007); WR35, DX-198, "Siegler Email to Clappart, October 4, 2007"].**

## CONCLUSIONS OF LAW – EXCULPATORY EVIDENCE

In Ex Parte Harleston 431 SW3d 67 (Tex. Crim. App. 2014), the Court held that when reviewing a habeas court's findings of fact and conclusions of law, "we defer to those findings and conclusions if they are supported by the record. We defer to those findings supported by the record because the habeas court is the 'original factfinder' and is in the best position to evaluate the credibility of the testifying witnesses. Ex Parte Reed, 271 SW3d 698 (Tex. Crim. App. 2008). However, our deference is not a rubber stamp, and we can invoke our authority as the ultimate fact finder to make contrary or alternative findings and conclusions when its independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record." See also Ex Parte Navarijo, 433 SW3d 558 (Tex. Crim. App. 2014).

In Ex Parte Villegas, 415 SW3d 885 (Tex. Crim. App. 2013) relief was granted because the defense was not able to present "evidence of an alternative perpetrator". While it is true in the current case that the defense was able to raise the issue of an alternative perpetrator, that effort was limited and hampered by the State's failure to disclose a number of crucial pieces of evidence that would have allowed a much more effective presentation of an alternative suspect as well as to more effectively cross examine Riley Joe Sanders.

19

A similar situation existed in Ex Parte Miles, 359 SW3d 647 (Tex. Crim. App. 2012). There the Court held that the defendant should get a new trial because the State had failed to disclose police reports that indicated other suspects. The Court held that "the State failed to disclose evidence which had been known to the prosecution but unknown to the defense. United States v. Agurs, 427 U.S. 97 (1976). Even if the prosecution was not personally aware of the evidence, the State is not relieved of its duty to disclose because 'the State' includes in addition to the prosecutors, other lawyers and employees in his office and members of law enforcement connected to the investigation and prosecution of the case." Kyles v. Whitley, 514 U.S. 419 (1995); Ex Parte Reed, 271 SW3d 698 (Tex. Crim. App. 2008). The Court also held that "the two undisclosed police reports are exculpatory and could have constituted impeachment evidence within the purview of Brady." Defense counsel asserted that the undisclosed reports "would have allowed him, at a minimum, to develop an alternate theory for the shooting". The Court ultimately held that "the disclosure of all of this information to the jury could have significantly undermined the confidence in the State's case."

That is exactly the situation at hand. The ultimate issue is whether the State's nondisclosure or late partial disclosure was sufficient to deny the defendant a fair trial.

The current prosecutors make a strong case urging that the trial jury heard the testimony and cross-examination of both the defendant and Riley Joe Sanders. The jury determined their credibility and elected to accept the testimony of Sanders and reject the testimony of the defendant. The jury then unanimously found the defendant guilty beyond a reasonable doubt.

20

But the story doesn't end there. The decision facing this habeas court is whether the non-disclosed or late disclosed information could have caused a different result. Like it or not, this Court has the duty to make that determination and it is likewise the duty of the Court of Criminal Appeals to accept the conclusion or to reach a different result.

Under both Brady v Maryland 373 U.S. 87 and United States v. Bagley, 473 U.S. 667 (1985), a defendant must show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the evidence was favorable to the defendant; and (3) the evidence is material and there would be a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. The Courts also held that "favorable evidence includes exculpatory evidence as well as impeachment evidence." They defined impeachment evidence as "evidence which disputes, disparages, denies or contradicts other evidence."

The Court further stated; "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense. The defendant must show that 'in the light of all of the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure. Thus, sometimes what appears to be a relatively inconsequential piece of potentially exculpatory evidence may take on added significance in light of other evidence at trial."

In Brady, the defendant contended that if the evidence had been disclosed, he would have modified his defensive strategies and the State would have had to alter its arguments.

21

That is exactly the contention currently advanced by the defendant's counsel. See also Pena v. State, 353 SW3d 797 (Tex. Crim. App. 2011).

This trial was very very fact specific. The case was circumstantial and both the Court of Appeals and the Court of Criminal Appeals devoted the majority of their long opinions to carefully reviewing the multitude of small details. That analysis increases the importance of the non-disclosed or late disclosed evidence at issue here.

In addition, the Court of Appeals in this cause found numerous instances of prosecutorial misconduct, but concluded: "While we certainly condemn such tactics, in light of the whole record, we cannot conclude that these errors were so prejudicial, or so inflamed the jury, that appellant was deprived of his substantial rights or a fair trial." The findings of this habeas Court enlarge and enhance that conclusion, and magnify the determination that the defendant was denied a fair trial.

As the Supreme Court noted in Brady: "Not without some doubt, we conclude that the withholding (of evidence) was prejudicial to the defendant Brady."

**After careful consideration and review of the law and all of the evidence produced at trial and in the writ hearing, "not without some doubt" the Court concludes that the defendant has shown he was denied a fair trial because of the State's failure to disclose or timely disclose favorable evidence; and had that evidence been disclosed or**

**disclosed timely, the results of the trial would have been different. This Court recommends that the Court of Criminal Appeals grant the defendant a new trial in this case.**

In conclusion, the Court expresses its deep gratitude to, and admiration of, the outstanding lawyers who represented both the defendant and the State at this lengthy habeas hearing. Their preparation and representation of their respective positions in an exceptionally professional and cooperative manner demonstrates the highest quality of our legal system.

Signed and entered on this the 6th day of July, 2015.

_____

Larry Gist, Judge Presiding

23

**2. Annotated Temple Findings (Citations with Additional Support)**

No. 1008763-A

IN THE 178TH DISTRICT COURT OF

HARRIS COUNTY, TEXAS

EX PARTE

DAVID MARK TEMPLE

FINDINGS OF FACT AND

COUCLUSIONS OF LAW

**INTRODUCTION**; The defendant was convicted by a jury of the murder of his wife, Belinda

Temple, and sentenced to serve life in the Department of Corrections. The Defendant appealed

and the conviction was affirmed by the 14th Court of Appeals. Temple v. State, 342 S.W.3rd 572

(2010); The Defendant appealed that decision to the Texas Court of Criminal Appeals which also

affirmed his conviction and sentence. Temple v. State, 390 S.W.3d 341 (2013).

The defendant then subsequently filed this application for writ of habeas corpus. The

defendant has advanced the following claims for relief:

1. The State suppressed evidence favorable to the Defense in violation of Kyles v.

   Whitley, 514 U.S. 419 (1995) and Brady v. Maryland, 373U.S. 83 (1963).

2. The State suppressed evidence that would have impeached the trial testimony of

   Riley Joe Sanders and Detectives Schmidt and Leitner in violation of United States v.

   Bagley, 473 U.S. 667 (1985).

3. The Trial Court failed to disclose Grand Jury testimony favorable to the Defendant.

1

4. The Defendant received ineffective representation from his trial counsel for failure to use information from the Defendant's father regarding the time available to the Defendant to commit the offense.

5. The Defendant received ineffective representation from his trial counsel for failure to get a continuance during trial.

6. The Trial Court deprived the Defendant of the right to investigate exculpatory evidence regarding an alternative suspect.

7. The Defendant is entitled to a new trial based on newly discovered evidence.

8. The Defendant is actually innocent.

Many of these claims were raised in one fashion or another during the direct appeals of this case. The Court of Appeals decision involved 61 pages and virtually all of them were devoted to discussions of the facts of this cause.

The opinion of the Court of Criminal Appeals with much smaller print was on 23 pages and virtually the entire opinion dealt with intensive factual analysis. Those two opinions highlight the critical nature of the facts of this case. The testimony is incredibly complex and intertwined.

The investigation of this murder involved over 400 single spaced investigator's reports. Over 30 witnesses appeared before the Grand Jury in the following months but no indictment was returned. **[WR32, DX-94-112, "Grand Jury Subpoenas" (19 total subpoenas); WR32, DX-92, "Grand Jury List of Witnesses " (15 witnesses testified before the Grand Jury)].** 5 years later the trial prosecutor took responsibility of the case

2

and she had the Defendant arrested **on November 30, 2004. [CR1, P.3, "Complaint"].**

**DeGuerin appeared as counsel of record on December 3, 2004. [CR1, P.5].** Then 2

years later, the Defendant was indicted by a Grand Jury which apparently heard no

witnesses. **[CR1, P.17, "2/28/2005 Indictment"].** The trial lasted for several weeks with

the jury finding the Defendant was guilty beyond a reasonable doubt. The trial

testimony was circumstantial and very fact specific, which lends some credibility to the

current Defense claim that critical exculpatory evidence was not disclosed.

The lead Prosecutor at trial was Kelly Siegler and the lead Defense Counsel was

Dick DeGuerin.

One of the major grounds on direct appeal dealt with a claim that the trial

prosecutor had engaged in misconduct to such a degree that it denied the Defendant a

fair trial. The claim was rejected by the Appellate Court, holding: "During the

emotionally charged four week trial, the prosecutor occasionally exceeded proper

questioning and argument when attacking the credibility of appellant and his family and

also apparently disobeyed or ignored a few of the trial court's rulings. While we

certainly condemn such tactics, in light of the whole record, we cannot conclude that

these errors were so prejudicial, or so inflamed the jury, that appellant was deprived of

his substantial rights or a fair trial."

The Court of Criminal Appeals held that the circumstantial evidence was

sufficient to support the conviction. But specifically, the Court held; "Appellant argues

that the evidence showing that Riley Joe Sanders, III had motive, opportunity and access

3

to a 12-gauge shotgun should have received more weight in the Court of Appeals analysis. The pertinent information about Sanders was presented to the jury, including his activities on the day of the murder and his use of shotguns. Additionally, Sanders himself testified. Appellant had the opportunity to cross-examine him, and the jury was able to assess his credibility. Furthermore, the jury also heard testimony that Sanders was repeatedly questioned and that the law enforcement officers were satisfied by his responses. It is the province of the jury to assess the credibility and demeanor of the witness. We are not the fact finders, and neither was the court of appeals. Further, it is not the State's burden to exclude every conceivable alternative to a defendant's guilt. Therefore, we hold that the evidence was sufficient to support Appellant's conviction for murder. The jury was rationally justified in finding Appellant guilty beyond a reasonable doubt."

It is thus apparent how critical the Defendant's current claims are. In the 2 and ½ month hearing conducted by this habeas Court, some things were absolutely clear. The lead prosecutor and the Defendant's lead attorney had a personal and contentious relationship and a professional battle of the highest degree. Both were famous and neither could stand losing to the other. Of enormous significance <u>was the prosecutor's testimony at the habeas hearing that apparently favorable evidence did not need to be disclosed if the State did not believe it was true.</u> **[WR7, P.249-50, 255-57].**

The Prosecutor also testified that although a large number of investigators were involved, she only elected to call a small number because she did not want the defense lawyer to have access to their offense reports. **[WR8, P.97-101; WR31, DX-89 "Siegler**

4

Subpoena List"]. At the time of this trial, the State was only obligated to provide offense reports after a law enforcement officer had testified. [WR11, P.26, L.23-25. In tendering only those reports for Holtke (WR30, DX-29) Leitner (WR30, DX-31) Shipley (WR30, DX-32) and Schmidt (WR30, DX-33), defense counsel was prevented from discovering the complete investigation of each testifying officer. WR12, P.15, L.16-20; Bock, Whichkowski, Scudder, Hernandez, Gonzalez and Jones were excluded from Siegler's list. Without offense reports or inclusion on a subpoenas list, defense counsel could not have discovered who all participated in the investigation. WR11, P.84].

The Prosecutor indicated that some exculpatory evidence was tendered to the defense in the middle of the trial. This gave the defense attorney little time to digest much less investigate that evidence. On one occasion, the defense did ask for a continuance for this purpose but the request was denied by the trial judge.

The hearing conducted in this Court involved the lengthy examination of over 30 witnesses and over 200 exhibits [WR1, 14-33 (292 Total Exhibits)], many of which were extensive and complex. Both the State and Defendant were permitted to tender proposed factual findings and arguments, and based on the testimony and exhibits, the Court hereby makes the following findings of facts and conclusions of law with regard to the Defendant's claims:

## FINDINGS OF FACT - INEFFECTIVE TRIAL REPRESENTATION

The Defendant now claims that his trial counsel, Dick DeGuerin was legally ineffective to the extent that he was deprived of appropriate representation. The Court hereby finds as facts:

1. Defense Counsel did not use Charles Kenneth Temple's written statement timeline.

2. Defense Counsel did file a Motion For Continuance when additional evidence was disclosed during trial by the Prosecutor. That Motion was denied by the Trial Judge. Defense Counsel did not urge another Continuance.

3. On direct appeal, the Appellate Court found that Trial Counsel waived any Brady claim based on the untimely motion for continuance and Counsel's failure to timely object at trial.

4. Trial Counsel received over 300 pages of offense reports **[Holtke (WR30, DX-29) Leitner (WR30, DX-31) Shipley (WR30, DX-32) and Schmidt (WR30, DX-33)]** to digest during trial, including portions dealing with the investigation of Sanders and his friends but made no objection regarding the large number of things that needed to be investigated. **Det. Schmidt approximated 4-6 hours to review 150 pages of offense report. [WR13, P.216, L.23-25]. The Lead Prosecutor would only allow Trial Counsel to review the reports within the interior of the court. [WR11, P.29-30]. Trial counsel only mentions "Casey Goosby" by name in urging the continuance. [TR25, P.5-14].**

6

## CONCLUSIONS OF LAW – INEFFECTIVE REPRESENTATION

Strickland v. Washington, 466 U.S. 668 (1984) sets out the standards that apply to claims of ineffective representation. See also Smith v. State, 286 S.W.3d 333 (Tex. Crim. App. 2009); Lopez v. State, 343 S.W.3d 137 (Tex. Crim. App. 2011). The defendant is not entitled to errorless counsel but rather to objectively reasonable representation.

To be entitled to prevail on a claim of ineffective representation, the defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. The second test must be sufficient to show that there was a probability sufficient to undermine confidence in the trial outcome to the degree that but for counsel's deficient performance, the result of the proceedings would have been different. Hernandez v. State, 726 S.W.3d 53 (Tex. Crim. App. 1986).

Trial counsel's performance was not perfect but much of the difficulty he faced was driven by a constant resistance of the trial prosecutor to reveal necessary information. Trial counsel continued to seek helpful information from the prosecutor but little was disclosed prior to trial. While substantial information was disclosed by the prosecutor during the trial, it was literally impossible for trial counsel to sufficiently investigate, verify or dispute the disclosures. In most instances, defense counsel was permitted to read documents and take notes but was not given copies.

7

The defendant's current claim that trial counsel provided ineffective representation has not been shown to meet the **Strickland** requirements and relief on this basis is not justified.

<u>FINDINGS OF FACT - ACTUAL INNOCENCE – NEWLY DISCOVERED EVIDENCE</u>

Some years after the conviction, Trial Counsel was contacted by Daniel Glasscock. Counsel took a sworn statement from Glasscock as well as a video recording. Glasscock passed a polygraph administered by the Harris County District Attorney's Office and retold his story a second time to DA Investigator Steve Clappert. Glasscock also testified at the habeas hearing conducted by this Court. The Court finds as a fact:

1. Glasscock told Trial Counsel that he overheard a conversation of Sanders shortly after the murder of Belinda Temple. Sanders admitted shooting his shotgun during the burglary of his neighbor's house. **[WR28, DX-1 "Oral/Videotaped Deposition of D. Glasscock"]**.

2. In subsequent statements given to this Court as well as Prosecutors, Glasscock substantially varied the facts originally given to Trial Counsel. In substance, Glasscock repudiated the most important details to the extent that his future credibility as a witness is significantly impaired. **[WR28, SX-78 "Transcription of D. Glasscock's Statement"; WR28, SX-79 "CD-D.Glasscock's Statement" (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT79.mp3.); WR28, SX-80 "Transcription of Clappart's interview of D. Glasscock's statement";**

8

WR28, SX-81 "Recorded Conversation of D. Glasscock" (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT81.mp3.); WR28, SX-83 "Recorded conversation of D. Glasscock" (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT81.mp3.); WR28, SX-84 "Recorded conversation of D. Glasscock (Media filed as part of the record, see file: TEMPLE-1008763-A-RR-STATE.EXHIBIT84.mp3.)].

## CONCLUSIONS OF LAW – ACTUAL INNOCENCE-NEWLY DISCOVERED EVIDENCE

The defendant is required to establish by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. Ex Parte Navarijo, 433 S.W.3d 558 (Tex. Crim. App. 2014). In order to determine whether the defendant has met this standard, the court must examine the new evidence in light of the evidence presented at trial. Ex Parte Thompson, 153 S.W.3d 417 (Tex. Crim. App. 2005); Ex Parte Elizondo, 947 S.W. 207 (Tex. Crim. App. 1996).

A person claiming actual innocence must show that the new evidence creates a doubt as to the correctness of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different on retrial, Ex Parte Holloway, 413 S.W.3d 95 (Tex. Crim. App. 2013) and that no reasonable juror would have convicted him in light of the new evidence.

Further, the defendant has a "Herculean task" when urging a new trial because of newly discovered evidence. Ex Parte Harleston, 431 S.W.3d 67 (Tex. Crim. App. 2014). This is because once the defendant has been afforded a fair trial and convicted,

9

the presumption of innocence disappears and it is entirely appropriate to apply an extraordinarily high standard of review. Herrera v. Collins, 506 U.S. 390 (1993).

**The new evidence provided by Glasscock does not meet this high standard even the version of his original statement to Dick DeGuerin. It further fails in light of his recanting much of his original statement. The defendant has not met the "Herculean task" required, and relief based on actual innocence is not justified.**

### FINDINGS OF FACT - EXCULPATORY EVIDENCE

The Court finds that trial prosecutors either intentionally, deliberately or negligently failed to disclose the following facts to the defendant or disclosed the facts during the actual trial that prevented the defendant from fairly being able to timely investigate or effectively use the evidence "irrespective of the good faith or bad faith of the prosecution" Brady v. Maryland, supra:

1. The report prepared by Dep. Hernandez concerning recovery of the H & R shotgun was lost, destroyed or never prepared, showing when, how, where and from whom the weapon was obtained. **[WR5, P.76-84; WR12, P.127-30, 169-70, 202-15; WR29, DX-3, Bates 450; WR29, DX-3, Bates 460 "Holtke's Offense Report"; WR26, SX-17 "Pasadena Lab Report"; SX-18 "HCSO Supplement Report"; SX-19 "HCSO Report";**

10

WR30, DX-4, "Leithner's Supplement Report"]. The H & R shotgun was recovered with a spent reloaded .00 buckshot shell still in the chamber. [WR11, P.34]. This was consistent with the same type of ammunition that was used in the murder of Belinda Temple [WR11, P.35].

2. Natalie Scott told investigators that the victim was having problems with a student and that she was worried that he knew where she lived. [WR29, DX-3, Bates 101-02, "Page Offense Report 1/12/99"].

3. Riley Joe Sanders was interviewed by 7 different officers on 6 days. After Sanders testified, the State did not disclose his oral statements [WR7, P.241; WR9, P.225] from Jan. 11, 1999 [WR29, DX-3, Bates 51-52] Jan. 12, 1999 [WR 29, DX-3, Bates 89], Jan. 14, 1999 [WR 29, DX-3, Bates 77-78, 105], Jan. 28, 1999 [WR12, P.127-30], Jan. 29, 1999 [WR29, DX-3, Bates 250-52], Jan. 25, 1999, [WR29, DX-3, Bates 214-17, "Hernandez Offense Report"] or Feb. 1, 1999 [WR27, DX-3, Bates 1939-40]; nor did the State produce any of the polygraph tests or questions used in the examinations. [TR25, P.5-14; WR3, P.9, L.10-14; WR9, P.192, L.11–P.194, L.1 (a third polygraph on Sanders was lost or destroyed)].

4. Cody Ellis was interviewed on Jan. 14 [WR29, DX-3, Bates 149-50], 25 [WR29, DX-3, Bates 214-17], and 28 [WR29, DX-3, Bates 824-26] 1999, and Feb. 10, 1999 [WR29, DX-3, Bates 279-80]. On the last occasion he was administered a polygraph test. He never mentioned that he was in possession of Sander's H & R shotgun. Although known to law enforcement, Ellis was never questioned about his hiding the H & R shotgun, later recovered with a spent reloaded .00 buckshot shell still in the

11

chamber; how the weapon came to be wrapped in a blood spotted towel; and the circumstances under which the H & R shotgun left Ellis' possession. **[WR29, DX-3, Bates 838-39 "Statement of Jonathan Pena"; WR32, DX-120, "Statement of Carlos Corro"].**

5. Recorded oral statements of Margaret Christenson **[WR23, P.19, L.14-19; reporting that she'd talked to Stacy Ferguson and Denise Lavoris about them seeing Belinda Temple in the parking lot after school on the phone with David]** and Stacy Ferguson, both of which saw the victim in the school parking lot shortly before her murder. **[WR35, DX-179 "Siegler's Handwritten List of Recorded Interviews"; WR35, DX-180 "Audiotapes"; WR23 P.17, L.1-13. Neither recorded statement was turned over to the defense after they testified; WR23, P.21-22 Stacey Nissley said the kid next door to Belinda was dangerous; WR23, P.25, L.5-6].**

6. On August 25, 2005 at a discovery hearing, the defendant requested all "documentation of leads of other suspects." **[TR4, P.45, L.20-22].** The Judge ordered disclosure of "any reports, documentation which reports tips, leads as to another person having committed this offense, that's Brady material." **[TR4, P.46, L.3-8 ("That certainly would be - - once again, this is a two-part request. Obviously any reports, documentation which reports tips, leads as to another person having committed this offense, that's Brady material. She has a duty to disclose that to you.")].** The trial prosecutor informed the Court that the police had checked out all of the calls and nothing came of those efforts. **[TR4, P.46, L.20–P.47, L.12].** Relying on the statement of the prosecutor, the Court denied the request. **[WR30, DX-18,**

12

"Affidavit/Partial Transcript of William Harmon"; TR4, P.48, L.5-8]. At that same hearing, the trial prosecutor informed the Court that the weapons recovered had nothing to do with the murder; that they were the wrong type of weapons; and the wrong type of ammunition. [TR4 P.54, L.20-23]. Finally, the trial prosecutor told the Court that there was no evidence favorable to the defense even though Mrs. had called law enforcement stating that her husband may have killed the victim. [WR7, P.244-45]. The Cain information was disclosed October 4, 2007, just 11 days prior to the beginning of trial. [WR23, P.76-77; WR32, DX-118, "Partial Transcript Between Siegler/DeGuerin"; WR29, DX-3, Bates 348, (Mrs. Cain made her report on November 5, 2004)].

7. Although required to disclose by the Court, the trial prosecutor did not disclose evidence of the Parker's dog barking near the time of the murder. [TR4 P.46-48, "August 25, 2005, Pretrial Hearing"; WR9, P.227-34; WR29, DX-3, Bates 19]. This information was gained by the defendant on October 16, 2007 after the first witness had testified. [TR9, P.97-102, P.115-17; WR32, DX-117, DX-117A, DX-117B, "Transcripts of Parker Interviews, October 17, 2007"]. The prosecutor failed to include information about the Parkers when she was reading the particular offense report containing the information to defense counsel. WR26, SX-25 "Dick DeGuerin Offense Report Notes"].

8. The State failed to produce prior to trial, the written statements of Cody Ellis, Cody Towner, Michael Gradham, Johathon Pena, Riley Joe Sanders, Casey Goosby [WR29, DX-3, Bates 263-65 (only an oral statement of Casey Goosby)] or Carlos Corro, all of

13

which would have supported an alternative suspect claim. **[WR9, P.225-28; WR12, 195-96].**

9. The trial prosecutor never produced an FBI report which profiled the possible killer. **[WR12, P.224-29, "Testimony of Det. Schmidt"; WR30, DX-5, "FBI Report"].**

10. In January, 1999, Riley Joe Sanders was interviewed by Officers Hernandez and Lampson and gave 2 oral statements. **[WR12, P.127-130 (These interviews took place on January 28 and 29); WR29, DX-3, Bates 250-52, "Leithner Supplemental Offense Report"].** Neither was disclosed. **[WR7, P.204, 241; WR9, P.225].**

11. On January 28, 1999, Cody Ellis give police a written statement. **[WR29, DX-3, Bates 824-26].** He did not reveal nor was he asked about his possession of the H & R shotgun. The written and oral statements were never disclosed. **[WR7, P.204].**

12. Jonathon Pena gave police a written statement indicating he was present at Casey Goosby's home when Goosby, Cody Ellis and Carlos Corro planned the Heatherington burglary; that shortly thereafter, Riley Sanders brought his H & R shotgun from home to go shooting with them; and Cody Ellis told him later that he was keeping Sanders shotgun under his bed. **[WR29, DX-3, Bates 838-39].**

13. On Feb. 1, 1999, Carlos Corro gave a written statement to police that he was aware Cody Ellis had been hiding Sander's shotgun under his bed and that he had participated in the Heatherington burglary. **[WR29, DX-3, Bates 840-42; WR9, P.188, L.24-25; WR9 P.189, L.1-6].**

14. On Feb. 1, 1999, Randall Hess gave a written statement to police. **[WR29, DX-3, Bates 836-37].** He indicated that Sanders, Granthom and Towner had come to his

14

house around 3:30 pm on January 11, 1999, looking for drugs and acting goofy as if they were already high.  **[WR29, DX-3, Bates 251, 257].**

15. In January, 1999, Joe Sosa reported that on the day of the murder, Towner and Granthom were at Sander's home at the time of the murder and that if you put a pillow over the muzzle of a shotgun, it would muffle the sound.  **[WR31, DX-90, "Schmidt's Offense Report"].**

16. On Feb.1, 1999, Towner is given a polygraph test. The questions asked were never disclosed.  **[WR3 P.9, L.10-14].**

17. On Feb. 1, 1999, Granthom gave a written statement to law enforcement and the contents have never been disclosed.  **[WR29, DX-3, Bates 251-52 (NOTE: When Siegler tendered a list of persons who testified by the before the grand jury, she identified Granthom as "Michael Joseph GRADAM"); WR32, DX-92 "List of Grand Jury Witnesses"].**

18. On Feb. 10, 1999, Granthom is given a polygraph test and although he was determined to be deceptive, the questions asked were never disclosed.  **[WR3, P.9, L.10-14].**

19. On January 12, 1999, Dennis Hundle is interviewed.  **[WR29, DX-3, Bates 97].**  Not disclosed were his statements that on January 11, 1999, after 2 p.m. he sees 2 white males in their 20's in a truck driving around the neighborhood and it appeared they had no destination.

20. In March, 1999, Corros is arrested with Ellis and Goosby doing "donuts" on the green belt in Katy, Texas and one was driving a white truck.  **[WR32, DX-127, "March 16,**

15

1999, Ft. Bend Sheriff's Offense Report" ("donut" driver of the small white car is Carlos Corros); WR34, DX-141, "July 6, 1999, Katy Police Department Offense Report" (Corro was a passenger in a white Dodge Ram pick-up truck)].

21. The State misrepresented the name of Carlos Corro as Carlos Gutierrez. **[TR26, P.198, L.1-13, "Carlos Carrero"; TR26, P.227, L.9-14 "Carlos Gutierrez"; TR26, P.230, L.2-5; TR26, P.233, L.23-25; WR32, DX-94 "Table of Contents from the Offense Report with Siegler's handwritten notes". Siegler obtained access to the entire offense report as early as November 2004. WR13, P.215-16. The offense reports are replete with references to Corro. Siegler was meticulous in her trial preparation and could not have been unaware of Corro's true identity. WR13, P.196, P.212, L.21–P.214, L.18].**

22. The State did not disclose the statement of Margaret Christian who saw the victim talking to the defendant on her cell phone between 3:20 pm and 3:30 pm on the day of her murder. **[(TR15, P.159-183; WR23 P.16-17). The State did not disclose the statement of Stacy Nissley who reported that Belinda believed the boy next door was dangerous, WR23, P.25].**

23. Det. Shipley repeatedly omitted favorable defense facts from her offense reports when she documented "synopses" of audio statements. **[WR30, DX-32, Bates 2201 "Shipley's Offense Report"].**

24. The main prosecutor denied ever having seen or listened to these audio recordings when in fact she was aware of them and had listened to them. **[WR10, P.107-111; WR35, DX-179, "Siegler's Handwritten List of Recorded Interviews"; WR35, DX-180**

16

"Audiotape" (Media filed as DEFENSE.EXHIBIT.180.mp3). During the writ hearing, the State represented to the court there were no other tapes in the states possession. WR10, P.111, L.10-15. Open records production revealed Alan Curry had created an inventory of the 11 boxes containing the State's file on Temple entitled "File Summary." WR33, DX-129, P.43 "September 5, 2012, Curry email to his home address". Within that document was an entry "Manila folder labeled "Taped WS's by Lampson / Shipley," containing One sheet of paper Two cassette recordings." On July 11, 2012, Curry forwarded that summary to Richard Holland. WR33, DX-129, P.234. On July 30, 2012, Andrew Smith emailed Curry so "the writs division could take over possession of the file." WR33, DX-129, P.70 "July 29, 2013, Email from Smith to Curry"].

25. The State did not disclose the identity of Denise Lavoris who could have confirmed seeing the victim in the parking lot after school which would have helped the defense timeline. [WR31, DX-89, "Subpoena List"; WR35, DX-180, "Audiotape" (Media filed as DEFENSE.EXHIBIT.180.mp3) "Audiotape" (M. Christenson and S. Ferguson both identify Denis Lavoris in their statements); The State's theory was predicated on a 45 minute window of opportunity, from 3:45pm to 3:32pm. WR32, DX-114 (Siegler's handwritten notes). Siegler testified that the timeline was crucial and it was going to be 'problematic' for the State. WR7, P. 136-138. On June 20, after oral arguments on Temple's Petition for Discretionary Review, Curry informs Siegler "A couple of the judges were concerned about the tight time frame in which the defendant needed to do all that he did in order to commit the offense

and stage the burglary and drive all around Katy." WR33, DX-129, P.26 (Email from Curry to Siegler)].

26. On January 25, 1999, Joe Cadena was interviewed by law enforcement and told them that around 4:25-4:30 pm he heard what sounded like a backfire from a car on the day of the murder. [WR27, SX-34, "Transcription of Conversation between DeGuerin/Siegler" (Siegler referencing Cadena Statement). During the writ hearing, lead investigator admitted Cadena was one of seven witnesses that reported hearing a possible gunshot at approximately 4:30PM – Joe Cadena, Jim and Kathy Parker and the 3 Roberts boys. WR12, P.223, L.11-15.

27. The State's theory was that the defendant's dog (Shaka) was in the backyard at the time of the murder. The State did not disclose witness statements from: Jackie and Anthony Mata that the dog had access to the garage [WR29, DX-3, Bates 95]; Justin Valdez that the dog had garage access and would act calm around him [WR29, DX-3, Bates 85]; and Terry Schultz that the dog had access to the garage. [WR29, DX-3, Bates 96]; Riley Joe Sanders told the Grand Jury that Shaka would bark if he mowed the lawn in the back yard, but if he just walked by their house "he would come by and sniff but that was about it. [WR9, P.82, L.7-8].

28. Deputy Brian Scudder saw the defendant after the murder with his head in his hands sobbing. [WR29, DX-3, Bates 17].

29. Roseanne Martinez reported that the defendant appeared weak kneed after discovering the victim's body. [WR29, DX-3, Bates 178].

30. Riley Joe Sanders identified Ryan Bruno's house. In one statement, he indicated nobody was home **[WR29, DX-3, Bates 828]** and in the other statement, that he had stayed five minutes. **[WR27, SX-45A "Sealed document, unsealed during hearing" (RJS Grand Jury Testimony, 4/21/1999)]**. Bruno was never interviewed nor was his identity disclosed. **[WR9, P.46-47 (Writ Testimony, K. Siegler); WR29, Bates 1570-1572 (GJ Testimony of M. Granthom)]**.

31. The State did not disclose the Harris County administrative bulletin indicating that the murder took place between 4:15 pm and 5:30 pm. **[WR29, DX-3, Bates 3, "Case Synopsis"]**.

32. During trial, the State failed to produce oral statements to law enforcement of witnesses after they had testified. **[The lead prosecutor testified that she copied oral statements from the offense reports to prepare her own witnesses to testify. WR7, P.241]**.

33. After conviction, the State's main prosecutor instructed law enforcement and District Attorney Officials not to disclose records pursuant to an Open Records request. **[WR32, DX-115, "Siegler Email Chain, November 20, 2007"; WR30, DX-34, "Siegler Email, November 30, 2007"]**. Disclosure was made only after these writ proceedings were initiated. **[WR5, P.49-53; WR17, P.66-88]**.

34. Years after leaving the District Attorney's Office, the lead trial prosecutor learned that Glasscock had approached Dick Deguerin. **[WR31, DX-79, "Email Report", "Bonds Email July 22, 2012"; WR35, DX-202, P.310 – 7/22/2012 – Siegler to Baldwin Chin – is this true?; WR33, DX-129, P.437 "7/22/2012 Siegler to John**

19

Brewer]. She then contacted a Sheriff's Deputy involved in the trial investigation [WR19, P.281-82; WR35, DX-169, "Cell Phone Records of Holtke"] and asked him to contact Glasscock and another witness [WR2, P.22-24 (Cody Ellis)] before they could be contacted by the Special Prosecutor or current members of the District Attorney's Office. [WR3, P.123, L.19–P.124, L.20 – Holtke prevented Clappart from interviewing Ellis. WR30, DX-7, "Affidavit/Arrest Warrant" (for Cody Ray Ellis); WR27, SX-43, "Sgt. Holtke Email to Curry, September 5, 2012"]. The Deputy did so and afterwards, their stories were significantly different than the original version. [Holtke informed Curry of his plan to interview Ellis on September 6, 2012, two days before the Special Prosecution had arranged for Clappart interview Ellis. WR27, SX-43. Holtke revealed confidential Glasscock information to Ellis. WR34, DX-137, "CD Audio Recording of C. Ellis". On Monday, September 10, 2012, by 12:01PM, Doyle and Lewis emailed Clappart and Beers of their representation of Ellis and Sanders, and requested all contact with their clients cease. WR35, DX-202, P.249, P.476. Cell phone records obtained by Beers reveal a Holtke, Siegler, Curry, Ellis, Sanders, Doyle and Lewis were in heavy communication with one another in the hours preceding this notification. WR34, DX-130, "Cellphone Excel Spreadsheet". They also reveal that Holtke maintained contact with Ellis in the days after he had obtained by counsel. WR35, DX-169, "Cell phone records of M. Holtke". WR27, SX-49, "Holtke Supplemental Report" (2012 Investigation); WR28, DX-1, "Oral/Videotaped Deposition of Daniel Glasscock" (by Dick DeGuerin); WR26, SX-11-12, "Audio Interview and Transcript of Audio Interview of D.

20

Glasscock" (by Steve Clappart); WR30, DX-6, "D. Glasscock Polygraph Report"; WR26, SX-13, "Videotaped Deposition of D. Glasscock"; WR27, SX-51-52, "Clegg's and Minchew's Supplemental Reports"].

35. Additionally, long after leaving the District Attorney's Office, when the original lead trial prosecutor learned of the newly discovered evidence investigation by the Special Prosecutor [WR8, P.16-17; WR33, DX-129, P.291-94, September 11 & 12, Email Exchange b/w Curry and Beers], she personally obtained representation for Riley Joe Sanders from two very talented criminal defense lawyers, Mac Segrest and Chip Lewis. [She also obtained counsel for Cody Ellis from Paul Doyle. WR19, P.281-82. WR4, P.77, L.1-12- Paul Doyle, former prosecutor, tried the Susan Wright Case w/ Siegler". Siegler testified she obtained counsel for Ellis and Sanders because she knew Clappart was coming to question them about Belinda Temple's murder. WR7, P.270, L.11-13. WR33, DX-129, P.291-94, September 11 & 12, Email Exchange b/w Curry and Beers. Doyle and Lewis notified law enforcement of their representation of Ellis and Sanders on September 10, 2012].

36. After the trial, the lead prosecutor Kelly Siegler ran for District Attorney against Pat Lykos and lost. [WR4, P.88]. After her defeat, she left the District Attorney's Office but through friends who remained on the staff, learned that Dick Deguerin had brought the Glasscock information to the new District Attorney for further investigation. [WR19, P.241-47. Siegler and her supporters believed the Glasscock investigation was political payback orchestrated by DeGuerin, Lykos and Leitner. WR4, P.88-96. "Dick DeGuerin told Pat Lykos he would support her for D.A. if she

would agree to let him reopen the Temple investigation any way he wanted to." WR7, P.274, L.13-15]. A Special Prosecutor was appointed and faced significant difficulty in investigating the validity of Glasscock's claim and subpoenaed cell phone records for Siegler, Holtke, Cody Ellis and Riley Joe Sanders, III, for the relevant time period of the Glasscock investigation (July 2012 through September 2012). Siegler accused Beers of acting at the direction of the Temple defense team and colluding with Pat Lykos. WR7, P.270-71.

Scott Durfee, General Counsel for the Harris County District Attorney's Office, described the appointment as an "informal recusal." WR35, DX-202, P.676, "September 10, 2012, Email from Durfee". Durfee acknowledged the potential conflict given Curry's continued representation of the State in the Temple direct Appeal. WR35, DX-202, P.676. Durfee deferred to Beers regarding the propriety of sharing details of the Glasscock investigation with Curry given the conflict. WR35, DX-202, P.676].

On August 17, 2012, Baldwin Chin was informed that a special prosecutor Beers had been appointed and that all investigative action was to be conducted through Beers. WR35, DX-202, P.440, "August 17, 2012, Email from Chin." On August 27, Curry was informed of the defense's specific claims for relief – that Siegler had hidden favorable evidence and that the were file a motion for relief based on the Glasscock information on Monday, September 10, 2012. WR35, DX-202, P.700. Holtke was informed that a special prosecutor had been appointed and that all investigative efforts were to be cleared through him. WR3, P.122, L.9-15.

22

Although Alan Curry was aware of the special prosecutor's appointment (WR35, DX-202, P.676), he continued to assist Sgt. Holtke in a parallel investigation of Glasscock. WR35, DX-173, August 30, 2012 Email to Alan Curry re: Grand Jury Subpoena. On August 29, 2012, at Dean Holtke's request, Curry removed a blue binder from the State's Temple file that documented an investigation in 1999 of "ALL Thefts, BMV, Burg Ors" from 97-99 in the Temple neighborhood. WR35, DX-202, P.698. This binder was discovered in the possession of the Harris County Sheriff's Office in 2015 during the writ hearing with a post-it note affixed to the front that read "To Dean Holtke Only From Alan Curry"].

37. Siegler lied to the trial judge about the phone numbers for the Roberts being disconnected. [TR6, P.7, L.25–P.8, L.8 (Pretrial Hearing October 4, 2007); WR35, DX-198, "Siegler Email to Clappart, October 4, 2007" (The same day, she gave her investigator a number at which she had been leaving messages)].

## CONCLUSIONS OF LAW – EXCULPATORY EVIDENCE

In Ex Parte Harleston 431 SW3d 67 (Tex. Crim. App. 2014), the Court held that when reviewing a habeas court's findings of fact and conclusions of law, "we defer to those findings and conclusions if they are supported by the record. We defer to those findings supported by the record because the habeas court is the 'original factfinder' and is in the best position to evaluate the credibility of the testifying witnesses. Ex Parte Reed, 271 SW3d 698 (Tex. Crim. App. 2008). However, our deference is not a rubber stamp, and we can invoke our authority as the ultimate fact finder to make contrary or alternative findings and conclusions when its

independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record." See also Ex Parte Navarijo, 433 SW3d 558 (Tex. Crim. App. 2014).

In Ex Parte Villegas, 415 SW3d 885 (Tex. Crim. App. 2013) relief was granted because the defense was not able to present "evidence of an alternative perpetrator". While it is true in the current case that the defense was able to raise the issue of an alternative perpetrator, that effort was limited and hampered by the State's failure to disclose a number of crucial pieces of evidence that would have allowed a much more effective presentation of an alternative suspect as well as to more effectively cross examine Riley Joe Sanders.

A similar situation existed in Ex Parte Miles, 359 SW3d 647 (Tex. Crim. App. 2012). There the Court held that the defendant should get a new trial because the State had failed to disclose police reports that indicated other suspects. The Court held that "the State failed to disclose evidence which had been known to the prosecution but unknown to the defense. United States v. Agurs, 427 U.S. 97 (1976). Even if the prosecution was not personally aware of the evidence, the State is not relieved of its duty to disclose because 'the State' includes in addition to the prosecutors, other lawyers and employees in his office and members of law enforcement connected to the investigation and prosecution of the case." Kyles v. Whitley, 514 U.S. 419 (1995); Ex Parte Reed, 271 SW3d 698 (Tex. Crim. App. 2008). The Court also held that "the two undisclosed police reports are exculpatory and could have constituted impeachment evidence within the purview of Brady." Defense counsel asserted that the undisclosed reports "would have allowed him, at a minimum, to develop an alternate theory for the shooting". The Court ultimately held that "the disclosure of all of this information to the jury could have significantly undermined the confidence in the State's case."

24

That is exactly the situation at hand. The ultimate issue is whether the State's nondisclosure or late partial disclosure was sufficient to deny the defendant a fair trial.

The current prosecutors make a strong case urging that the trial jury heard the testimony and cross-examination of both the defendant and Riley Joe Sanders. The jury determined their credibility and elected to accept the testimony of Sanders and reject the testimony of the defendant. The jury then unanimously found the defendant guilty beyond a reasonable doubt.

But the story doesn't end there. The decision facing this habeas court is whether the non-disclosed or late disclosed information could have caused a different result. Like it or not, this Court has the duty to make that determination and it is likewise the duty of the Court of Criminal Appeals to accept the conclusion or to reach a different result.

Under both Brady v Maryland 373 U.S. 87 and United States v. Bagley, 473 U.S. 667 (1985), a defendant must show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the evidence was favorable to the defendant; and (3) the evidence is material and there would be a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. The Courts also held that "favorable evidence includes exculpatory evidence as well as impeachment evidence." They defined impeachment evidence as "evidence which disputes, disparages, denies or contradicts other evidence."

The Court further stated; "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not

25

establish materiality in the constitutional sense. The defendant must show that 'in the light of all of the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure. Thus, sometimes what appears to be a relatively inconsequential piece of potentially exculpatory evidence may take on added significance in light of other evidence at trial."

In Brady, the defendant contended that if the evidence had been disclosed, he would have modified his defensive strategies and the State would have had to alter its arguments. That is exactly the contention currently advanced by the defendant's counsel. See also Pena v. State, 353 SW3d 797 (Tex. Crim. App. 2011).

This trial was very very fact specific. The case was circumstantial and both the Court of Appeals and the Court of Criminal Appeals devoted the majority of their long opinions to carefully reviewing the multitude of small details. That analysis increases the importance of the non-disclosed or late disclosed evidence at issue here.

In addition, the Court of Appeals in this cause found numerous instances of prosecutorial misconduct, but concluded: "While we certainly condemn such tactics, in light of the whole record, we cannot conclude that these errors were so prejudicial, or so inflamed the jury, that appellant was deprived of his substantial rights or a fair trial." The findings of this habeas Court enlarge and enhance that conclusion, and magnify the determination that the defendant was denied a fair trial.

As the Supreme Court noted in Brady: "Not without some doubt, we conclude that the withholding (of evidence) was prejudicial to the defendant Brady."

26

After careful consideration and review of the law and all of the evidence produced at trial and in the writ hearing, "not without some doubt" the Court concludes that the defendant has shown he was denied a fair trial because of the State's failure to disclose or timely disclose favorable evidence; and had that evidence been disclosed or disclosed timely, the results of the trial would have been different. This Court recommends that the Court of Criminal Appeals grant the defendant a new trial in this case.

In conclusion, the Court expresses its deep gratitude to, and admiration of, the outstanding lawyers who represented both the defendant and the State at this lengthy habeas hearing. Their preparation and representation of their respective positions in an exceptionally professional and cooperative manner demonstrates the highest quality of our legal system.

Signed and entered on this the 6th day of July, 2015.

_____
Larry Gist, Judge Presiding

27

**3. CD with Annotated Findings (PDF with linked sources and sources file)**

3. CD with Annotated Findings (PDF with linked sources file)

| EX PARTE | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| DAVID MARK TEMPLE | § | 178TH DISTRICT COURT |

## ORDER

On this the _____ day of _____ 2015, came on to be heard the Applicant's request for this Court to enter amended Findings of Fact and Conclusions of Law. The Court hereby grants his requests and hereby enters the attached amended Findings of Fact and Conclusions of Law. The Harris County District Clerk is hereby ordered to file the attached Findings of Fact and Conclusions of Law and then forward them along with the accompanying disc to the Texas Court of Criminal Appeals in Austin, Texas. The Clerk is notify the parties when the findings are forwarded to the Court of Criminal Appeals.

Signed and entered on this the _____ day of _____ 2015.

_____
Larry Gist, Judge

4